Barry I. Levy, Esq.
Michael Vanunu, Esq.
Garin Scollan, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance*
*Company, GEICO Indemnity Company, GEICO General*
*Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY and GEICO
CASUALTY COMPANY,

                      Plaintiffs,

       -against-

ELENA BORISOVNA STYBEL, D.O., ELENA
BORISOVNA STYBEL, M.D. (A Sole Proprietorship)
and JOHN DOE DEFENDANTS "1" through "10",

                      Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No.:_____ (     )

**Plaintiff Demands a Trial by Jury**

## <u>COMPLAINT</u>

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants Elena Borisovna Stybel, D.O., Elena

Borisovna Stybel, M.D. (A Sole Proprietorship), and John Doe Defendants "1" through "10"

(collectively, referred to hereinafter as the "Defendants"), hereby allege as follows:

## <u>NATURE OF THE ACTION</u>

1.       This action seeks to recover more than $1,455,000.00 that the Defendants have wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise non-reimbursable healthcare services styled as extracorporeal shockwave therapy (hereinafter "ESWT" or the "Fraudulent Services").  The Fraudulent Services allegedly were provided to New York automobile accident victims who were insured by GEICO ("Insureds").   In addition to recovering the money wrongfully obtained, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of approximately $797,000.00 in pending no-fault insurance claims for the Fraudulent Services because:

(i)       the Fraudulent Services were allegedly provided by and billed through the Stybel Practice (as defined below), which is a medical "practice" not under the control and direction of Elena Borisovna Stybel, D.O., but rather, was at all relevant times operated, managed, and controlled by the John Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers;

(ii)       the Fraudulent Services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics (as defined below);

(iii)       the Fraudulent Services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds;

(iv)       the claim submissions seeking payment for the Fraudulent Services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided to Insureds; and

(v)       the Fraudulent Services, to the extent provided at all, were not provided by Elena Borisovna Stybel, D.O. or any other licensed physician, but by persons who were unlicensed, and were neither directly supervised by Elena

Borisovna Stybel, D.O. or employed by her or the Stybel Practice (as defined below).

2.      Defendant Elena Borisovna Stybel, D.O. ("Stybel") is a New York physician who purports to own and operate a medical "practice" under a sole proprietorship using Tax Identification Number 55-086xxxx (the "Stybel Practice")(collectively, the "Stybel Defendants"), and purports to have used that medical "practice" to provide ESWT to more than six-hundred sixty (660) GEICO Insureds in a period of less than ninety (90) days.  In fact, the Stybel Defendants in combination with the John Doe Defendants, engaged in a massive fraudulent insurance scheme against GEICO and the New York automobile insurance industry in which they billed GEICO alone more than $2,517,000.00 for the alleged performance of the Fraudulent Services at more than thirty-five (35) separate locations from July 1, 2021 to September 25, 2021.  Notably, more than 1,300 claim submissions were made to GEICO seeking payment of no-fault benefits for the Fraudulent Services, all of which represented that Stybel was the legitimate owner of the Stybel Practice and that she allegedly performed all the Fraudulent Services. In truth, Stybel performed none of the Fraudulent Services and did not legitimately operate, manage or control the Stybel Practice.

3.      In or about 2021, the Defendants engineered this fraudulent scheme on the heels of material changes adopted by the New York Department of Financial Services regarding the application of the New York Workers Compensation Fee Schedule ("Fee Schedule") to New York's no-fault reimbursement.  Those changes eliminated billing abuses and fraudulent treatment practices that had plagued the automobile insurance industry for more than a decade by, among other things, (i) making many services that had been historically abused either ineligible for reimbursement or subject to reduced reimbursement, (ii) limiting chiropractor billing to CPT codes in the chiropractic section of the fee schedule, and (iii) controlling reimbursement among providers

who rendered concurrent care to patients by establishing daily reimbursement limits for all related disciplines.

4. In contrast to these changes, the Fee Schedule changes did not materially alter reimbursement for performance of the Fraudulent Services and, importantly, for the first time established a definitive rate of reimbursement of approximately $700.00 for performance of ESWT, which has historically been a Category III Code (0101T) with a "BR" designation, meaning that definitive reimbursement had not previously been established. Prior to October 2020, ESWT was virtually never performed on automobile accident patients or billed to automobile insurers, in part because of the lack of established reimbursement and because – if properly performed – service required considerable investment, including direct involvement by a physician in the performance of the service and the use of physical equipment that is very costly and is not typically portable.

5. Defendants seized on these changes in the Fee Schedule (or lack thereof). The Stybel Defendants in association with the John Doe Defendants "1" through "10" (the "John Doe Defendants"), concocted a fraudulent treatment and billing scheme pursuant to which:

    (i)    unlicensed "technicians" would allegedly render the Fraudulent Services on an itinerant basis at a large number of multidisciplinary clinics located throughout the New York metropolitan area that purported to provide treatment to patients with no-fault insurance, but which in actuality were organized to supply convenient, one-stop shops for no-fault insurance fraud (the "Clinics"),

    (ii)    the unlicensed "technicians" would then generate falsified reports to create a false justification for the performance of the medically unnecessary and illusory Fraudulent Services, and

    (iii)    the reports, documents and bills for thousands of dollars per patient per date of treatment would be sent to New York automobile insurance companies, including GEICO, seeking payment for the performance of the Fraudulent Services.

4

6.     The success of the fraudulent scheme required coordination between the Stybel Defendants and the John Doe Defendants.  In furtherance of the fraudulent scheme, they took the following actions:

(i)     Stybel allowed the John Doe Defendants to use her name, medical license and the Stybel Practice to bill GEICO and other New York automobile insurance companies for the alleged performance of the Fraudulent Services.

(ii)    Stybel Defendants associated with "processors" who are among the John Doe Defendants.  Processors are individuals and/or entities within the no-fault industry who earn money by: (i) establishing relationships with laypersons that are associated with the Clinics, (ii) collecting the no-fault claims (i.e. the paperwork) from the Clinics for services that are allegedly provided to individuals covered by no-fault insurance, and (iii) referring the no-fault billing and collection work to New York collection lawyers.

(iii)   Stybel Defendants, through their association with the John Doe Defendants, established (i) illegal referral and kickback arrangements with the owners and/or managers of the Clinics to allow the Defendants to access a steady stream of patients to be able to fraudulently bill GEICO and other automobile insurers, and exploit New York's no-fault insurance system for financial gain without regard to genuine patient care.

7.     Once the pieces were in place, the John Doe Defendants (i) used Stybel's medical license, tax identification number of the Stybel Practice and electronic copies of her signature to generate mass quantities of false and fraudulent documents, including NF-3 forms (i.e. bills), assignment of benefit forms, and medical records, and (ii) used the Stybel Practice as a fictional healthcare "practice" to serve as the billing vehicle through which millions of dollars of billing for the Fraudulent Services could be submitted to GEICO and other New York automobile insurers.

8.     Because the Stybel Practice was nothing more than a shell to hide the John Doe Defendants' participation in the scheme, it was equally critical to the success of the fraudulent scheme for the Stybel Defendants and John Doe Defendants to partner with New York collection attorneys who were willing to:

(i)     purport to represent the physician and the billing entity;

5

(ii)    provide for or arrange for "funding" (i.e. financing against receivables) of the fraudulent billing to be submitted to GEICO and other New York insurers in connection with the unlawful scheme through companies in which the attorney/law firms either owned or with whom they had relationships;

(iii)   pursue payment and collection against GEICO and other New York automobile insurers by knowingly (a) submitting fraudulent bills to the insurers for the Fraudulent Services, and (b) pursuing collection lawsuits and/or arbitrations seeking payment on the claims that were denied or claimed to have been improperly paid; and

(iv)   accept the insurance payments received from automobile insurers through their attorney IOLA/Trust accounts, and then distribute the payments to third parties, including the John Doe Defendants.

9.     At the time, the John Doe Defendants had an ongoing relationship with several collection attorneys, and because of their position in the industry and ongoing relationships, the John Doe Defendants had in their possession copies of documents used by the collection lawyers that would be needed to facilitate the funding (i.e., the securing of advances against the claims) and the billing and collections on the fraudulent claims, including documents such as retainer letters, payment directives, and funding agreements.

10.    At the time, the John Doe Defendants used the information received from Stybel to manufacture: (i) the claim documents necessary to support the fraudulent claim submissions, including assignment of benefits ("AOBs") forms and other medical records, (ii) the engagement letter and associated documents needed by the collection lawyers to bill and collect on the Fraudulent Services, and (iii) the funding agreements to present to companies who were willing to advance money against the receivables (the "Funders").  Once the documents were in place with the Funders, the Funders began transferring money to the John Doe Defendants as "advances" against the claims for the Fraudulent Services. John Doe Defendants were not signatories to the funding agreements, received the money without risk, and used the payments received from the

Funders for their own benefit, as well as to pay individuals and entities to perpetuate the Defendants' fraudulent scheme.

11.     Additionally, the John Doe Defendants regularly provided the package of documents associated with billing, collection and funding efforts to the collection lawyers and thereafter, began to transfer fabricated claim documents to the collection lawyers.  Once the documents were processed by the collection lawyers into bills (i.e., "NF-3" forms) using the name of the Stybel Practice, the collection lawyers organized the claim submissions and mailed them to GEICO and other insurance companies seeking payment.  The collection lawyers:

(i)     purported to represent Stybel and the Stybel Practice in thousands of writings sent to GEICO;

(ii)    arranged and/or interfaced to effectuate the "funding" of the bills that were submitted to GEICO and other New York insurers in the name of the Stybel Practice;

(iii)   systemically pursued payment and collection against GEICO and other New York automobile insurers on behalf of the Stybel Practice, and

(iv)    collected insurance payments from GEICO and other New York automobile insurers and deposited those payments into their IOLA/Trust Accounts.

12.     As discussed herein, the Defendants at all relevant times have known that: (i) Stybel was not in the control of the Stybel Practice, but was operated, managed and controlled by the John Doe Defendants for purposes of effectuating a large scale insurance fraud scheme, (ii) the Fraudulent Services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons and as a result of illegal financial arrangements between the Defendants and the Clinics, (iii) the Fraudulent Services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds, and (iv) the Fraudulent Services, to the extent provided at all, were never performed by Stybel or by any other licensed physician

but by persons who were never supervised by Stybel nor employed by the Stybel Practice.  The chart annexed hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that the Defendants submitted, or caused to be submitted, to GEICO.

13.     Defendants do not now have – and never had – any right to be compensated for or to realize any economic benefit from the Fraudulent Services that they billed to GEICO.

14.     Defendants' fraudulent scheme began in 2021 and has continued uninterrupted through the present day as Defendants continue to seek collection on pending charges for the Fraudulent Services.  As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $1,455,000.00.

## THE PARTIES

### I.     Plaintiffs

15.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.    Defendants and Other Relevant Individuals

16.     Defendant Stybel resides in and is a citizen of New York.  Stybel is a physician licensed to practice medicine and agreed to allow for the formation of the Stybel Practice and to "front" as its owner while allowing the John Doe Defendants to use her license and the Stybel Practice as a billing "vehicle" as part of the fraudulent scheme committed against GEICO and other New York automobile insurers.

17.     Stybel Practice is a New York sole proprietorship that lists its principal place of business as 3063 Brighton 8th Street, Floor 2, Brooklyn, New York (the 8th Street Location).

18.    John Doe Defendants are citizens of New York.  John Doe Defendants are unlicensed, non-professional individuals and entities, presently not identifiable to GEICO, who knowingly participated in the fraudulent scheme with the Stybel Defendants by (i) unlawfully operating, managing and controlling the Stybel Practice, (ii) establishing relationships with the laypersons associated with the Clinics, (iii) collecting the no-fault claims (i.e., the paperwork) from the Clinics for the Fraudulent Services, (iv) arranged for and providing the funding associated with the Fraudulent Services, and (v) referring the no-fault billing and collection work associated with the Fraudulent Services to New York collection lawyers.

## JURISDICTION AND VENUE

19.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interests and costs, and is between citizens of different states.

20.    Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq., the Racketeer Influenced and Corrupt Organizations ("RICO") Act, because they arise under the laws of the United States. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

21.    Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

22.    GEICO underwrites automobile insurance in New York.

## I.    An Overview of Pertinent Law Governing No-Fault Reimbursement

23.    New York's no-fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

24.    No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses incurred for health care goods and services, including medical services.

25.    An Insured can assign his/her right to No-Fault Benefits to health care goods and services providers in exchange for those services.

26.    Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").  In the alternative, a health care provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

27.    Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

28.    The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New

York State or local licensing requirement necessary to perform such service in New York ….  (Emphasis added).

29.     In New York, only a licensed physician may: (i) practice medicine; (ii) own or control a medical professional corporation; (iii) employ and supervise other physicians; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

30.     Unlicensed non-physicians may not: (i) practice medicine; (ii) own or control a medical professional corporation; (iii) employ and supervise other physicians; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

31.     New York law prohibits licensed healthcare services providers, including physicians, from paying or accepting kickbacks in exchange for patient referrals.  See, e.g., New York Education Law §§ 6509-a; 6530(18); and 6531.

32.     New York law prohibits unlicensed persons not authorized to practice a profession, like medicine, from practicing the profession and from sharing in the fees for professional services. See, e.g., New York Education Law § 6512, § 6530(11), and (19).

33.     Therefore, under the No-Fault Laws, a health care provider is not eligible to receive No-Fault Benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in exchange for patient referrals, if it permits unlicensed laypersons to control or dictate the treatments or allows unlicensed laypersons to share in the fees for the professional services.

34.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005) and Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed physicians may practice medicine in

New York because of the concern that unlicensed physicians are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

35.     Pursuant to the No-Fault Laws, only health care providers in possession of a <u>direct</u> assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her health care provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits <u>directly</u> to providers of health care services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

36.     Accordingly, for a health care provider to be eligible to bill for and to collect charges from an insurer for health care services pursuant to Insurance Law § 5102(a), it must be the <u>actual</u> provider of the services. Under the No-Fault Laws, a professional corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

37.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

38.     When a healthcare services provider submits a claim for No-Fault Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code was performed on the patient; (ii) the service described by the specific CPT code was performed in a competent manner and in accordance with applicable laws and regulations; (iii) the service described by the specific CPT

code was reasonable and medically necessary; and (iv) the service and the attendant fee were not excessive.

39.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a health care provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.     Defendants' Fraudulent Scheme

### A.     Stybel and Her Recruitment

40.     Stybel is a Doctor of Osteopathic Medicine, and became licensed to practice medicine in New York in 2002.  According to public record searches, Stybel operates a small family practice under the name "Amityville Family Practice" in Suffolk County from the following location on 100 West Oak Street in Amityville, New York:



41.     In contrast to her family practice, the Stybel Practice represented that it operated

from the 8th Street Location.   The 8th Street Location does not publicly associate to Stybel in any

manner.   Rather, the 8th Street Location identifies solely with a practice known as Chiropractic

Wellness Center and Alex Khait, D.C. ("Khait"), a New York chiropractor.   Khait is no stranger

to no-fault insurance schemes and was previously named as a defendant by GEICO in a federal

lawsuit entitled Government Employees Insurance Company, et al. v. Alex Khait, et al., 1:17-cv-

1881-PKC-SJB (E.D.N.Y. 2017) ("GEICO v. Khait").   In that lawsuit it was revealed that:

(i)     Khait's entities issued tens of thousands of dollars in checks to fictitious
entities that were also paid by Tea Kaganovich ("Kaganovich") and Ramazi
Mitaishvili ("Mitaishvili"), two individuals who, while pleading guilty to
health care fraud, admitted to paying approximately $18.5 million in
kickbacks for the referral of patients to their diagnostic testing facilities in
Brooklyn, Queens, and the Bronx. United States of America v. Tea
Kaganovich, Ramazi Mitaishvili, 17-CR-00649 (E.D.N.Y. 2019).   Both
Kaganovich and Mitaishvili invoked their Fifth Amendment privilege
against self-incrimination in a civil action when asked whether they had
issued checks to certain sham companies as payments in exchange for
patient referrals.

(ii)    Khait's entities had received a large number of checks that were illegally
exchanged for cash at a check-cashing facility in New Jersey – Cambridge
Clarendon Financial Service, LLC d/b/a United Check Cashing
("Cambridge Clarendon").   Virtually all these checks were exchanged for
cash by an individual named Alla Kuratova ("Kuratova"), who was
previously indicted for recruiting individuals to act as phony patients in
connection with an illegal prescription drug trafficking ring, and from
approximately May 2017 through May 2021, Kuratova illegally exchanged
over $35 million worth of checks, made out to over 1,000 different
companies, for cash at Cambridge Clarendon.

42.     Stybel is also familiar with illegal kickback and patient referral relationships. Prior

to the establishment of the Stybel Practice, Stybel had formed several other medical professional

corporations, including Downstate Medical Care, P.C., EPS Medical, P.C., and Interstate Medical

Care, P.C. that billed for the performance of healthcare services.   Like the Khait entities, checks

issued to Stybel's other professional corporations were also illegally exchanged for cash at

Cambridge Clarendon by Kuratova.  For example, between September 2018 and April 2019, Kuratova cashed multiple checks written to two of Stybel's professional corporations, EPS Medical, P.C. and Interstate Medical Care, P.C., for no legitimate purpose.

43.     In 2021, Stybel was recruited by the John Does Defendants to participate in a complex insurance fraudulent scheme to bill GEICO and other New York automobile insurers millions of dollars for medically unnecessary, experimental, and otherwise reimbursable services. Based on the arrangement, Stybel would receive a periodic payment in exchange for allowing her name, license and the tax identification number of the Stybel Practice to be used and would contend that she supervised the Fraudulent Services if any insurance company ever inquired.  At the time, Stybel was a perfect candidate for the scheme because (i) she was familiar with no-fault billing and kickback schemes that had involved her prior professional corporations, and (ii) was in significant financial debt, with over $261,000.00 in outstanding judgments against her.

**B.      Gaining Access to Insureds**

44.     Stybel Practice had no legitimate indicia.  It had no fixed treatment locations of any kind, did not maintain a stand-alone practice, was not the owner or leaseholder in any of the real property from which it purported to provide the Fraudulent Services, did not employ its own support staff, and did not advertise or market its services to the general public.

45.     In fact, the John Doe Defendants controlled the fraudulent scheme by using the name of Stybel and the Stybel Practice on an itinerant basis in connection with the performance of the Fraudulent Services from more than thirty-five (35) separate Clinics, primarily located in Brooklyn, Queens, and Bronx, where they were given access to steady volumes of patients pursuant to the unlawful referral arrangement, including the following:

| Clinic - Street Address | Clinic – Borough |
|---|---|
| 1110 Pelham Parkway | Bronx |
| 150 Graham Avenue | Brooklyn |
| 1611 E New York Avenue | Brooklyn |
| 1568 Ralph Avenue | Brooklyn |
| 2088 Flatbush Avenue | Brooklyn |
| 717 Southern Boulevard | Bronx |
| 282-284 Avenue X | Brooklyn |
| 430 W Merrick Road | Valley Stream |
| 3000 Eastchester Road | Bronx |
| 79-45 Metropolitan Avenue | Queens |
| 611 East 76th Street | Brooklyn |
| 219-16 Linden Boulevard | Queens |
| 175 Fulton Avenue | Hempstead |
| 488 Lafayette Avenue | Brooklyn |
| 647 Bryant Avenue | Bronx |
| 332 E 149th Street | Bronx |
| 2386 Jerome Avenue | Bronx |
| 4250 White Plains Road | Bronx |
| 1894 Eastchester Road | Bronx |
| 4014A Boston Road | Bronx |
| 62-69 99th Street | Queens |
| 3626 E Tremont Avenue | Bronx |
| 176 Wilson Avenue | Brooklyn |
| 2273 65th Street | Brooklyn |
| 1655 Richmond Avenue | Staten Island |

46.     To obtain access to the Clinics' patient base (i.e., the Insureds), the Defendants entered into illegal financial and kickback arrangements with the unlicensed persons who controlled the Clinics, who provided access to the patients that were treated, or who purported to be treated, at the Clinics.   Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, the Clinics in actuality, were organized to supply "one-stop" shops for no-fault insurance fraud.

47.     Clinics provided facilities for the Defendants, as well as a "revolving door" of healthcare services professional corporations, chiropractic professional corporations, physical

therapy professional corporations, and/or a multitude of other purported healthcare providers, all geared towards exploiting New York's no-fault insurance system.

48.     In fact, GEICO received billing from an ever-changing number of fraudulent healthcare providers at many of the Clinics, starting and stopping operations without any purchase or sale of a "practice", without any legitimate transfer of patient care from one professional to another, and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

49.     For example, GEICO has received billing for purported healthcare services rendered at the Clinic located at 717 Southern Boulevard, Bronx from a revolving door of more than one hundred seventy (170) purportedly different healthcare providers.  GEICO also received billing for purported healthcare services rendered at the Clinic located at 1568 Ralph Avenue, Brooklyn from a revolving door of more than one hundred (100) purportedly different healthcare providers.  GEICO also received billing for purported healthcare services rendered at the Clinic located at 1894 Eastchester Road, Bronx and the Clinic located at 1110 Pelham Parkway, Bronx from a revolving door of more than ninety (90) purportedly different healthcare providers at each Clinic.

50.     Furthermore, some of the Clinics where the Defendants purportedly provided Fraudulent Services to Insureds include locations that have been the subject of a recent indictment involving numerous individuals who allegedly paid monies to hospitals, medical providers and others for confidential patient information and the patients would be contacted and "referred" for medical treatment from a select network of medical clinics (and lawyers) in New York and New

Jersey that paid kickbacks to the indicted individuals. See United States of America v. Anthony Rose, et al., 19-cr-00789(PGG)(SDNY 2019).

51.     Clinics willingly provided access to the Defendants in exchange for kickbacks and other financial incentives because the Clinics were facilities that sought to profit from the "treatment" of individuals covered by no-fault insurance and therefore catered to high volumes of Insureds at the locations.

52.     In general, the referral sources at the Clinics were paid a sum of money in untraceable cash or payments typically disguised as "rent".  They were in reality, kickbacks for referrals, and the relationship was a "pay-to-play" arrangement. In connection with this arrangement, when an Insured visited one of the Clinics, he or she was automatically referred by one of the Clinic's "representatives" for the performance of the Fraudulent Services.

53.     In keeping with the fact that the Clinics controlled the patient base and that the Stybel Practice was simply one of several interchangeable "cogs" in the fraud wheel, there were numerous instances between July 2021 and September 2021 where the Stybel Practice was (i) allegedly providing the Fraudulent Services on Insureds at a Clinic location at the same time that other medical practices were performing the Fraudulent Services on Insureds, and (ii) was one of numerous "providers" rendering the Fraudulent Services at specific Clinic locations in alternating weekly sequences.

54.     Clinic "representatives" typically making the referrals were receptionists or some other non-medical personnel who simply directed or "steered" the Insureds to whichever practice was being given access to the Insureds on a given day pursuant to the unlawful payment and referral arrangement.

## C.       Defendants Place the Fraudulent Scheme Into Motion

55.      Once all the necessary "pieces" were in place and Stybel had turned control over to the John Doe Defendants, the fraud scheme was placed into overdrive.  John Doe Defendants began to illegally operate and manage the Stybel Practice and implemented the fraudulent billing and treatment scheme using a "quick hit" strategy, billing GEICO and other New York automobile insurers millions of dollars for the performance of the Fraudulent Services in a matter of months, thereby attempting to limit the insurance companies' ability to investigate and address the scheme.

56.      As part of the scheme, the John Doe Defendants arranged to have the account receivables associated with the GEICO billings for the Fraudulent Services "funded" through the Funders with the assistance of the collection lawyers and arranged for documents to be signed directing the payments to be made to them and other third parties rather than Stybel.

57.      As a result of those efforts, the John Doe Defendants received millions of dollars in advances on the claims for the Fraudulent Services from the Funders without any risk because they were never signatories to the agreements.  In addition, the John Doe Defendants had the collection lawyers begin billing GEICO and other New York automobile insurers for the Fraudulent Services.

58.      Through the funding and collection arrangement, the John Doe Defendants controlled the Stybel Practice and were able to realize an immediate financial benefit because they were paid a percentage on the face value of the billings submitted to GEICO for the Fraudulent Services.  The collection lawyers (in turn) would be compensated through the payment of other monies from the insurance companies, including legal fees associated with the collections as well as interest and other charges to be repaid from the collections on the claims for the Fraudulent Services.

59.     In furtherance of this scheme, from July 26, 2021 through October 31, 2021 (during a period of approximately 90 days), GEICO received through the United States mail, bills, AOBs, and other records from the Defendants (through the collection lawyers) with respect to more than 1,300 bills involving more than 660 separate patients and seeking payment of more than $2.5 million.

60.     Each of the claims was accompanied by a letter from the collection lawyers, representing that they were legal counsel to Stybel and the Stybel Practice in connection with the collection of charges from GEICO for the performance of the Fraudulent Services.

**D.      The Fraudulent Billing and Treatment Protocols Employed by The Defendants**

61.     The Fraudulent Services billed in the name of the Stybel Practice were not medically necessary and were provided, to the extent they were provided at all, pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds.  The Fraudulent Services were further provided pursuant to the dictates of unlicensed laypersons not permitted by law to render or control the provision of healthcare services.

62.     Neither Stybel nor any other licensed physicians were ever involved in the performance of the Fraudulent Services.   In fact, unlicensed laypersons, rather than any healthcare professionals working in the Clinics, developed and controlled the patient base at the Clinics.  Once they were given access, the John Doe Defendants arranged to have Insureds at the Clinics subjected to the Fraudulent Services by unlicensed technicians that they controlled despite there being no clinical basis for the services, and submit to purported therapy services that were experimental and investigational, among other things, all solely to maximize profits without regard to genuine patient care.

63.     In fact, there was no physician involvement with the performance of any of the Fraudulent Services and the only point in having the Insureds seen by the unlicensed technicians was to get the patient's signature on a piece of paper so that the John Doe Defendants could get money from the Funders and transmit the claims to the collection lawyers so that they could generate bills and submit them to GEICO seeking payment for the Fraudulent Services to earn their compensation.

64.     Regardless of the nature of the accidents or the actual medical needs of the Insureds, the John Doe Defendants purported to subject virtually every Insured to a pre-determined fraudulent treatment protocol without regard for the Insureds' individual symptoms or presentment.  Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

65.     No legitimate physician or other licensed healthcare provider would permit the fraudulent treatment and billing protocol described below to proceed under his or her auspices. This conclusion is reinforced by the fact that there was no physician involvement in any of the Fraudulent Services allegedly performed on Insureds and billed to GEICO.

### 1.     The Fraudulent Charges for "Extracorporeal Shockwave Therapy"

66.     Defendants purported to systemically subject Insureds to medically unnecessary ESWT "treatments".  In keeping with the fact that the Defendants intended to conceal the absence of any physician involvement and that the Stybel Practice was just one of several billing entities that they used, the John Doe Defendants arranged to have the services documented on a generic

"form" that intentionally avoided referencing Stybel or the Stybel Practice.  The following is a representative example:



67.    Of consequence, the "notes" associated with the ESWT "treatments" never identified who actually performed the service, but the claims that were submitted to GEICO by the Defendants included an NF-3 form that falsely represented that Stybel performed the actual service:

**VERIFICATION OF TREATMENT BY ATTENDING PHYSICIAN OR OTHER PROVIDER OF HEALTH SERVICE**
**PAGE 3**

16. IF TREATING PROVIDER IS DIFFERENT THAN BILLING PROVIDER COMPLETE THE FOLLOWING:

| TREATING PROVIDER'S NAME | TITLE | LICENSE OR CERTIFICATION NO | BUSINESS RELATIONSHIP CHECK APPLICABLE BOX | | |
|---|---|---|---|---|---|
| | | | EMPLOYEE | INDEPENDENT CONTRACTOR | OTHER (SPECIFY) |
| Elena Borisovna Stybel | MD | Lic # 224376 | No | | |
| | | | | | |
| | | | | | |

17 IF THE PROVIDER OF SERVICE IS A PROFESSIONAL SERVICE CORPORATION OR DOING BUSINESS
UNDER AN ASSUMED NAME (DBA), LIST THE OWNER AND PROFESSIONAL LICENSING CREDENTIALS OF
ALL OWNERS (Provide an additional attachment if necessary).

Elena Borisovna Stybel     224376     OWNER

| 18. IS PATIENT STILL UNDER YOUR CARE FOR THIS CONDITION? | YES ☐ | NO ☐ |
|---|---|---|

19. ESTIMATED DURATION OF FUTURE TREATMENT

Not Determined at this time

68.     The billing data associated with the claims submissions made to GEICO corroborates the fraudulent nature of the billing/treatment protocols.   According to the billing, the ESWT "treatment" alleged to have been performed on Insureds between July 1, 2021 to September 25, 2021(less than 90 days) purported that:  (i) more than 1,300 separate dates of service were performed; (ii) the service was performed on at least 660 separate patients; (iii) the service was performed at more than thirty five (35) separate locations; and (iv) the services were provided at multiple locations at the same day, with multiple instances including ten (10) or more separate treatment locations on some days.

69.     Once documented by the unidentified technicians, the Defendants then billed GEICO for the performance of ESWT using the tax identification under associated with the Stybel Practice using CPT code 0101T.

**CATEGORY III CODES**

**Medical Fee Schedule**

**0042T–0504T**

**Effective April 1, 2019**

| | | Code | Description | Relative Value | FUD | PC/TC Split |
|---|---|---|---|---|---|---|
| ■ | | 0042T | Cerebral perfusion analysis using computed tomography with contrast administration, including post-processing of parametric maps with determination of cerebral blood flow, cerebral blood volume, and mean transit time | 15.44 | XXX | |
| ■ | + | 0054T | Computer-assisted musculoskeletal surgical navigational orthopedic procedure, with image-guidance based on fluoroscopic images (List separately in addition to code for primary procedure) | 2.47 | XXX | |
| ■ | + | 0055T | Computer-assisted musculoskeletal surgical navigational orthopedic procedure, with image-guidance based on CT/MRI images (List separately in addition to code for primary procedure) | 3.23 | XXX | |
| | | 0058T | Cryopreservation; reproductive tissue, ovarian | BR | XXX | |
| | | 0071T | Focused ultrasound ablation of uterine leiomyomata, including MR guidance; total leiomyomata volume less than 200 cc of tissue | BR | XXX | |
| | | 0072T | Focused ultrasound ablation of uterine leiomyomata, including MR guidance; total leiomyomata volume greater or equal to 200 cc of tissue | BR | XXX | |
| ■ | | 0075T | Transcatheter placement of extracranial vertebral artery stent(s), including radiologic supervision and interpretation, open or percutaneous; initial vessel | 18.68 | XXX | |
| ■ | + | 0076T | Transcatheter placement of extracranial vertebral artery stent(s), including radiologic supervision and interpretation, open or percutaneous; each additional vessel (List separately in addition to code for primary procedure) | 17.50 | XXX | |
| | | 0085T | Breath test for heart transplant rejection | BR | XXX | |
| | + | 0095T | Removal of total disc arthroplasty (artificial disc), anterior approach, each additional interspace, cervical (List separately in addition to code for primary procedure) | BR | XXX | |
| | + | 0098T | Revision including replacement of total disc arthroplasty (artificial disc), anterior approach, each additional interspace, cervical (List separately in addition to code for primary procedure) | BR | XXX | |
| ■ | | 0100T | Placement of a subconjunctival retinal prosthesis receiver and pulse generator, and implantation of intra-ocular retinal electrode array, with vitrectomy | 16.22 | XXX | |
| ■ | | 0101T | Extracorporeal shock wave involving musculoskeletal system, not otherwise specified, high energy | 2.78 | XXX | |

70.     As noted, CPT code 0101T is listed in the Fee Schedule as a "temporary code" identifying emerging and experimental technology. Temporary codes may become permanent codes or deleted during updates of the code set.   Additionally, and as noted in the Fee Schedule, the CPT code (i) is scheduled to be paid using the conversion rate for surgical services, and (ii) does not distinguish between a professional component and technical component, thus confirming that the service need be performed by a licensed physician to be reimbursable.

71.     Furthermore, the ESWT allegedly performed on Insureds was fraudulent because the service that was allegedly provided does not qualify for reimbursement under the CPT code for several independent reasons.   In the first instance, the charges were fraudulent in that the unlicensed technicians controlled by the John Doe Defendants did not even actually provide ESWT or any service that satisfied the requirements of CPT code 0101T.   Rather, the John Doe Defendants arranged to have the unlicensed technicians perform Radial Pressure Wave Therapy

on the Insureds.  Radial Pressure Wave Therapy involves the low energy delivery of compressed air and is incapable of generating a true shock wave.  Radial Pressure Wave Therapy does not satisfy the requirements of CPT code 0101T, which requires "high energy" shockwave.

72.     Second, the charges were fraudulent because the use of ESWT for the treatment of back, neck, and shoulder pain is experimental and investigational in nature.  In fact, and in keeping with that characterization: (i) the use of ESWT has not been approved by the US Food and Drug Administration ("FDA") for the treatment of back, neck, or shoulder pain, (ii) there are no legitimate peer reviewed studies that establish the effectiveness of ESWT for the treatment of back, neck, or shoulder pain, and (iii) the Centers for Medicare & Medicaid Services has published coverage guidance for ESWT stating that further research is needed to establish the efficacy and safety of ESWT in the treatment of musculoskeletal conditions; that there is uncertainty associated with this intervention; and it not reasonable and necessary for the treatment of musculoskeletal conditions and therefore not covered.

73.     Notwithstanding the experimental nature, the Defendants purportedly provided ESWT as part of a pre-determined fraudulent protocol to virtually every Insured, without regard to each Insured's individual complaints, symptoms, or presentation.  In furtherance of that, the Defendants typically submitted a boilerplate, checklist treatment report containing a stamped signature, not an actual signature, and the ESWT was provided to Insureds soon after their accident without giving the patients the opportunity to sufficiently respond to conservative therapies.

74.     For example, the Defendants typically rendered ESWT to Insureds less than twenty (20) days after the accidents, including the following examples:

(i)     Defendants purported to provide ESWT through the Stybel Practice to an Insured named KP on September 16, 2021, only 14 days after the Insured's accident on September 2, 2021.

(ii)   Defendants purported to provide ESWT through the Stybel Practice to an Insured named MY on September 16, 2021, only three days after the Insured's accident on September 13, 2021.

(iii)   Defendants purported to provide ESWT through the Stybel Practice to an Insured named VF on August 19, 2021, only ten days after the Insured's accident on August 9, 2021.

(iv)   Defendants purported to provide ESWT through the Stybel Practice to an Insured named AB on August 11, 2021, only eight days after the Insured's accident on August 3, 2021.

(v)   Defendants purported to provide ESWT through the Stybel Practice to an Insured named JW on August 23, 2021, only nine days after the Insured's accident on August 14, 2021.

(vi)   Defendants purported to provide ESWT through the Stybel Practice to an Insured named DS on August 26, 2021, only 13 days after the Insured's accident on August 13, 2021.

(vii)   Defendants purported to provide ESWT through the Stybel Practice to an Insured named KT on August 9, 2021, only 10 days after the Insured's accident on July 30, 2021.

(viii)   Defendants purported to provide ESWT through the Stybel Practice to an Insured named NM on July 29, 2021, only 12 days after the Insured's accident on July 17, 2021.

(ix)   Defendants purported to provide ESWT through the Stybel Practice to an Insured named AB on July 19, 2021, only eight days after the Insured's accident on July 11, 2021.

(x)   Defendants purported to provide ESWT through the Stybel Practice to an Insured named TM on July 8, 2021, only ten days after the Insured's accident on June 28, 2021.

75.   These are only representative examples. Additionally, the Defendants routinely provided ESWT to multiple Insureds involved in the same accident from the same Clinics.  For example:

(i)   On March 7, 2021, two Insureds – BM and OP – were involved in the same automobile accident. Thereafter, BS and OP both presented to the same Clinic located at 3632 E Tremont Avenue, Bronx, New York, and each purportedly received ESWT.

(ii)     On March 16, 2021, three Insureds – CF, MG, and AF – were involved in the same automobile accident. Thereafter, CF, MG, and AF all presented to the same Clinic located at 4014A Boston Road, Bronx, New York, and each purportedly received ESWT.

(iii)    On April 11, 2021, two Insureds – JM and FD – were involved in the same automobile accident. Thereafter, JM and FD both presented to the same Clinic located at 430 W Merrick Road, Valley Stream, New York, and each purportedly received ESWT.

(iv)    On April 19, 2021, two Insureds – LG and TH – were involved in the same automobile accident. Thereafter, LG and TH both presented to the same Clinic located at 1110 Pelham Parkway, Bronx, New York, and each purportedly received ESWT.

(v)     On April 24, 2021, three Insureds – OB, KP, and EB – were involved in the same automobile accident. Thereafter, OB, KP, and EB all presented to the same Clinic located at 79-45 Metropolitan Avenue, Flushing, New York, and each purportedly received ESWT.

(vi)    On May 11, 2021, two Insureds – PR and VM – were involved in the same automobile accident. Thereafter, PR and VM both presented to the same Clinic located at 1894 Eastchester Road, Bronx, New York, and each purportedly received ESWT.

(vii)   On June 4, 2021, two Insureds – PB and RC – were involved in the same automobile accident. Thereafter, PB and RC both presented to the same Clinic located at 717 Southern Boulevard, Bronx, New York, and each purportedly received ESWT.

(viii)  On June 26, 2021, two Insureds – SH and JR – were involved in the same automobile accident. Thereafter, SH and JR both presented to the same Clinic located at 3000 Eastchester Road, Bronx, New York, and each purportedly received ESWT.

(ix)    On August 9, 2021, two Insureds – GR and AS – were involved in the same automobile accident. Thereafter, GR and AS both presented to the same Clinic located at 717 Southern Boulevard, Bronx, New York, and each purportedly received ESWT.

(x)     On August 16, 2021, three Insureds – JP, DB, and JG – were involved in the same automobile accident. Thereafter, JP, DB, and JG all presented to the same Clinic located at 4250 White Plains Road, Bronx, New York, and each purportedly received ESWT.

76.     These are only representative examples. In all the claims identified in Exhibit "1",

the Defendants falsely represented that Fraudulent Services were medically necessary, when in

fact they were not medically necessary for each Insured and provided pursuant to predetermined

fraudulent protocols, and were therefore not eligible to collect No-Fault Benefits in the first

instance.

77.     In addition to the billing for ESWT being fraudulent for the reasons described

above, the charges were also fraudulent because the bills misrepresented the amounts collectible

for each date of service.  More specifically, CPT Code 0101T only contemplates the billing for the

code once per date of service.  The code specifically describes the service as pertaining to the

"musculoskeletal system", not a patient's individual limb or spine/trunk sections.

78.     Notwithstanding the clear language of the code, the bills fraudulently unbundled

the service in the billing that was prepared and submitted by duplicating the code multiple times

(and increasing the corresponding charges) for each section of the Insured's body to which the

ESWT was performed.  The following are representative examples:

**15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY**

| Date of Service | Place of Service Including Zip Code | Description of Treatment or Health Service Rendered | Unit | Fee Schedule Treatment Code | Charges |
|---|---|---|---|---|---|
| 07/07/2021 | 1568 RALPH AVE, BROOKLYN, NY, 11234 | EXTRACORPOREAL SHOCK WAVE & RADIAL PRESSURE WAVE CERVICAL AREA | 1 | 0101T | $ 700 39 |
| 07/07/2021 | 1568 RALPH AVE, BROOKLYN, NY, 11234 | EXTRACORPOREAL SHOCK WAVE & RADIAL PRESSURE WAVE THORACIC AREA | 1 | 0101T | $ 700 39 |
| 07/07/2021 | 1568 RALPH AVE, BROOKLYN, NY, 11234 | EXTRACORPOREAL SHOCK WAVE & RADIAL PRESSURE WAVE LUMBAR AREA | 1 | 0101T | $ 700 39 |
| 07/07/2021 | 1568 RALPH AVE, BROOKLYN, NY, 11234 | EXTRACORPOREAL SHOCK WAVE & RADIAL PRESSURE WAVE LEFT KNEE | 1 | 0101T | $ 700 39 |

**TOTAL CHARGES TO DATE  $ 2801.56**

**15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY**

| Date of Service | Place of Service Including Zip Code | Description of Treatment or Health Service Rendered | Unit | Fee Schedule Treatment Code | Charges |
|---|---|---|---|---|---|
| 08/12/2021 | 150 GRAHAM AVE, BROOKLYN, NY, 11206 | EXTRACORPOREAL SHOCK WAVE & RADIAL PRESSURE WAVE CERVICAL AREA | 1 | 0101T | $ 700 39 |
| 08/12/2021 | 150 GRAHAM AVE, BROOKLYN, NY, 11206 | EXTRACORPOREAL SHOCK WAVE & RADIAL PRESSURE WAVE LEFT SHOULDER | 1 | 0101T | $ 700 39 |
| 08/12/2021 | 150 GRAHAM AVE, BROOKLYN, NY, 11206 | EXTRACORPOREAL SHOCK WAVE & RADIAL PRESSURE WAVE LUMBAR AREA | 1 | 0101T | $ 700 39 |

**TOTAL CHARGES TO DATE  $ 2101.17**

79.     In doing so, the Defendants artificially and fraudulently increased the amount of reimbursement to which they would be entitled by three (3) to four (4) times for each date of service.

### E.      The Fraudulent Billing for Independent Contractor Services

80.     The fraudulent scheme also included the submission of claims to GEICO using the Stybel Practice seeking payment for services provided by individuals that the Stybel Practice never employed.

81.     Under the New York no-fault insurance laws, billing entities (including sole proprietorships) are ineligible to bill for or receive payment for goods or services provided by independent contractors.  The healthcare services must be provided by the billing provider itself, or by its employees.

82.     Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that billing entities are not entitled to receive reimbursement under the New York no-fault insurance laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services");  DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-21-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion

Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals).

83. From July 2021 through October 2021, more than 1,300 separate bills were sent to GEICO using the United States mails seeking payment for the Fraudulent Services purportedly performed by individuals other than Stybel, while falsely representing in every bill that Stybel was the provider of the service in question. This was done intentionally and to avoid the possibility that insurance companies such as GEICO would deny the bill for eligibility if an accurate representation been made regarding who actually performed the services and their relationship to the billing provider, which was being unlawfully operated and controlled by the John Doe Defendants.

84. In fact, virtually every NF-3 form that was submitted to GEICO appeared as follows:

**VERIFICATION OF TREATMENT BY ATTENDING PHYSICIAN OR OTHER PROVIDER OF HEALTH SERVICE**
**PAGE 3**

16. IF TREATING PROVIDER IS DIFFERENT THAN BILLING PROVIDER COMPLETE THE FOLLOWING:

| TREATING PROVIDER'S NAME | TITLE | LICENSE OR CERTIFICATION NO | BUSINESS RELATIONSHIP CHECK APPLICABLE BOX | | |
|---|---|---|---|---|---|
| | | | EMPLOYEE | INDEPENDENT CONTRACTOR | OTHER (SPECIFY) |
| Elena Borisovna Stybel | MD | Lic # 224376 | No | | |
| | | | | | |
| | | | | | |

17 IF THE PROVIDER OF SERVICE IS A PROFESSIONAL SERVICE CORPORATION OR DOING BUSINESS UNDER AN ASSUMED NAME (DBA), LIST THE OWNER AND PROFESSIONAL LICENSING CREDENTIALS OF ALL OWNERS (Provide an additional attachment if necessary).

Elena Borisovna Stybel    224376    OWNER

| 18. IS PATIENT STILL UNDER YOUR CARE FOR THIS CONDITION? | YES ☐ | NO ☐ |
|---|---|---|

19. ESTIMATED DURATION OF FUTURE TREATMENT

Not Determined at this time

85. In fact, the statements in each of the NF-3 forms were false and fraudulent in that the unlicensed technicians who performed the Fraudulent Services were never (i) employed by Stybel or the Stybel Practice, or (ii) under Stybel's direction and/or control. In fact, the unlicensed technicians were simultaneously performing services for multiple other "providers" being operated and controlled by the John Doe Defendants and were paid without regard to the physician's name or entity through whom the Fraudulent Services were billed.

86. Because the Fraudulent Services, to the extent provided at all, were performed by individuals not employed by Stybel and/or the Stybel Practice, the Defendants never had any right to bill or to collect No-fault Benefits for that reason or to realize any economic benefit from the claims seeking payment for the Fraudulent Services, in addition to all others identified in this Complaint. The misrepresentations and acts of fraudulent concealment outlined in this Complaint were consciously designed to mislead GEICO into believing that it was obligated to pay the claim submissions.

III. **The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO**

87. To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted to GEICO thousands of NF-3 forms, AOBs and medical reports/records using the name of the Stybel Practice and its tax identification number seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

88. The NF-3 forms, reports, AOBs and other documents submitted to GEICO by and on behalf of Defendants were false and misleading in the following material respects:

(i) The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of the Defendants uniformly misrepresented that Stybel had performed the Fraudulent Services and that her name, license and the tax identification number of the Stybel Practice was being legitimately used to bill for the Fraudulent Services, making them eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) despite the fact that

the John Doe Defendants unlawfully and secretly controlled, operated and managed the medical "practice".

(ii)    The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of the Defendants, uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided.

(iii)   The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of the Defendants, uniformly concealed the fact that the Fraudulent Services were provided -- to the extent provided at all – pursuant to illegal kickback and referral arrangements.

(iv)    The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of the Defendants uniformly misrepresented that the Fraudulent Services were medically necessary when the Fraudulent Services were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; and

(v)     The NF-3 forms, letters and other supporting documentation submitted by, and on behalf of, the Defendants, uniformly misrepresented to GEICO that the claims were eligible for payment pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 even though the services were provided by unlicensed individuals not employed by Stybel or the Stybel Practice.

## IV.   **Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

89.     Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

90.     To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, Defendants systematically made material misrepresentations, concealed their fraud and the underlying fraudulent scheme and went to great lengths to accomplish this concealment.

91.     Specifically, the Defendants knowingly misrepresented and concealed facts related to the participation of Stybel in the performance of the Fraudulent Services and Stybel's ownership, control and/or management of the Stybel Practice. Additionally, the Defendants

entered into complex financial arrangements with one another that were designed to, and did, conceal the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

92.     Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed, to the extent they were performed at all, pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Services.  In addition, the Defendants knowingly misrepresented and concealed facts related to the employment status of the unlicensed individuals to prevent GEICO from discovering that the Fraudulent Services were not eligible for reimbursement because they were not provided by individuals that were employed by Stybel and/or the Stybel Practice.

93.     GEICO takes steps to timely respond to all claims and to ensure that No-fault claim denial forms or requests for additional verification of No-fault claims are properly addressed and mailed in a timely manner. GEICO is also under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $1,455,000.00 based upon the fraudulent charges.

94.     Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## AS AND FOR A FIRST CAUSE OF ACTION
**Against Stybel and the Stybel Practice**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

95.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 94 of this Complaint as if fully set forth at length herein.

96.     There is an actual case and controversy between GEICO on the one hand and Stybel and the Stybel Practice on the other hand regarding more than $797,000.00 in unpaid billing for the Fraudulent Services that has been submitted to GEICO.

97.     Stybel and the Stybel Practice have no right to receive payment from GEICO on the unpaid billing because the billed for services were submitted through a medical practice not legitimately owned or controlled by a licensed physician, but which was being operated, managed, and controlled by the John Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers.

98.     Stybel and the Stybel Practice have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to illegal kickbacks and referral relationships between the Defendants and the Clinics.

99.     Stybel and the Stybel Practice have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to predetermined fraudulent protocols that serve to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds.

100.     Stybel and the Stybel Practice have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services were not medically necessary and were provided –

to the extent that they were provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers.

101.    Stybel and the Stybel Practice have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services fraudulently misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

102.    Stybel and the Stybel Practice have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services fraudulently misrepresented that they were performed by Stybel and were instead performed - to the extent that they were provided at all - by unlicensed individuals who were neither supervised by nor employed by Stybel or the Stybel Practice.

103.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Stybel and the Stybel Practice have no right to receive payment for any pending bills submitted to GEICO.

**AS AND FOR A SECOND CAUSE OF ACTION**
**Against Stybel and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

104.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 94 of this Complaint as if fully set forth at length herein.

105.    Stybel Practice is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce. Stybel and the John Doe Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of the Stybel Practice's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges seeking payments that the Stybel Practice was not eligible to receive under the No-Fault Laws because: (i) the billed for services

were submitted through a medical practice not legitimately owned or controlled by a licensed physician, but which was being operated, managed, and controlled by the John Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the billed for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics; (iii) the billed for services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (iv) the claim submissions seeking payment for the billed for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided; and (v) the billed for services - to the extent provided at all - were not provided by Stybel or any other licensed physician, but by persons who were unlicensed, and not directly supervised by Stybel or employed by the Stybel Practice.  The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

106.    Stybel Practice's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which the Defendants operated the Stybel Practice, inasmuch as the Stybel Practice never operated as a legitimate medical practice, never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for the Stybel Practice to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud

implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through the Stybel Practice to the present day.

107.    Stybel Practice is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other New York automobile insurers. These inherently unlawful acts are taken by the Stybel Practice in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,455,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Stybel Practice.

108.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A THIRD CAUSE OF ACTION
**Against Stybel and John Doe Defendants "1" through "10"**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

109.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 94 of this Complaint as if fully set forth at length herein.

110.    Stybel Practice is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

111.    Stybel and the John Doe Defendants are employed by and/or associated with the Stybel Practice. Stybel and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Stybel Practice's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that the Stybel Practice was

not eligible to receive under the No-Fault Laws because: (i) the billed for services were submitted through a medical practice not legitimately owned or controlled by a licensed physician, but which was being operated, managed, and controlled by the John Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the billed for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics; (iii) the billed for services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (iv) the claim submissions seeking payment for the billed for services uniformly misrepresented and exaggerated the level, nature, necessity; and results of the Fraudulent Services that purportedly were provided; and (v) the billed for services - to the extent provided at all - were not provided by Stybel or any other licensed physician, but by persons who were unlicensed, and not directly supervised by Stybel or employed by the Stybel Practice.  The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

112.    Stybel and the John Doe Defendants knew of, agreed to and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

113.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,455,000.00 pursuant to the fraudulent bills submitted by Defendants through the Stybel Practice.

114.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**Against All Defendants**
**(Common Law Fraud)**

115.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 94 of this Complaint as if fully set forth at length herein.

116.     Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

117.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Stybel had performed the Fraudulent Services and that her name, license and the tax identification number of the Stybel Practice was being legitimately used to bill for the Fraudulent Services, making the eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) when in fact Stybel never performed any of the services and the John Doe Defendants unlawfully and secretly controlled, operated and managed the Stybel Practice; (ii) the representation that the billed for services had been rendered and were reimbursable, when in fact the claim submissions uniformly misrepresented and exaggerated the level, nature, necessity, and results of the services that purportedly were provided; (iii) the representation that the billed for services were eligible for reimbursement, when in fact the services were provided -- to the extent provided at all – pursuant to illegal kickback and referral arrangements between the Defendants and the Clinics; (iv) the representation that the billed for services were medically necessary when they were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed

healthcare providers; and (v) the representation the billed for services were eligible for payment because the services were provided by Stybel, when in fact the services were provided by unlicensed individuals that were never supervised by Stybel nor employed by the Stybel Practice.

118.    Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through the Stybel Practice that were not compensable under New York no-fault insurance laws.

119.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $1,455,000.00 pursuant to the fraudulent bills submitted by the Defendants.

120.    Defendants extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

121.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A FIFTH CAUSE OF ACTION
### Against All Defendants
### (Unjust Enrichment)

122.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 94 of this Complaint as if fully set forth at length herein.

123.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

124.    When GEICO paid the bills and charges submitted by or on behalf of the Stybel Practice for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants improper, unlawful, and/or unjust acts.

125.    Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

126.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

127.    By reason of the above, Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,455,000.00.

## JURY DEMAND

128.    Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor and against the Defendants, as follows:

A.    On the First Cause of Action against Stybel and the Stybel Practice, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Stybel and Stybel Practice have no right to receive payment for any pending bills for the Fraudulent Services submitted to GEICO;

B.    On the Second Cause of Action against Stybel and John Doe Defendants "1" through "10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,455,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.      On the Third Cause of Action against Stybel and John Doe Defendants "1" through "10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,455,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against all Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,455,000.00 together with punitive damages, costs, interest, and such other and further relief as the Court deems just and proper;

E.      On the Fifth Cause of Action against all Defendants, more than $1,455,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper; and

Dated: May 16, 2022

RIVKIN RADLER LLP

By:   /S/ *Barry I. Levy*
        Barry I. Levy, Esq.
        Michael Vanunu, Esq.
        Garin Scollan, Esq.
926 RXR Plaza
Uniondale, New York 11556
 (516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*