# EXHIBIT "5"

Barry I. Levy, Esq.
Michael Vanunu, Esq.
Garin Scollan, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance
Company, GEICO Indemnity Company, GEICO General
Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY and GEICO
CASUALTY COMPANY,

                  Docket No.:_____ (    )

             Plaintiffs,

      -against-

                                 **Plaintiff Demands a Trial by
Jury**

ELENA BORISOVNA STYBEL, D.O., ELENA
BORISOVNA STYBEL, M.D. (A Sole Proprietorship),
EVERGREEN & REMEGONE LLC, YANA
MIRONOVICH, NEW YORK BILLING AND
PROCESSING CORP., ERIC MELADZE, BLUE TECH
SUPPLIES INC., SUNSTONE SERVICES INC., and
JOHN DOE DEFENDANTS "1" through "10",

             Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## <u>AMENDED COMPLAINT</u>

Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Amended Complaint against Defendants Elena Borisovna Stybel, D.O.

("Stybel"), Elena Borisovna Stybel, M.D. (A Sole Proprietorship), Evergreen & Remegone LLC

("Evergreen"), Yana Mironovich ("Mironovich"), New York Billing and Processing Corp. ("NY

Billing"), Eric Meladze ("Meladze"), Blue Tech Supplies Inc. ("Blue Tech"), Sunstone Services Inc.

("Sunstone"), and John Doe Defendants "1" through "10" (the "John Doe Defendants")

(collectively, referred to hereinafter as the "Defendants"), hereby allege as follows:

## NATURE OF THE ACTION

1.     This action seeks to recover more than $1,455,000.00 that Defendants have

wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of

fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise

non-reimbursable healthcare services styled as extracorporeal shockwave therapy (hereinafter

"ESWT" or the "Fraudulent Services").

2.     The Fraudulent Services allegedly were provided to New York automobile accident

victims who were insured by GEICO ("Insureds"). In addition to recovering the money wrongfully

obtained, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of

approximately $797,000.00 in pending no-fault insurance claims for the Fraudulent Services

because:

> (i)     the Fraudulent Services were allegedly provided by and billed through the Stybel Practice (defined below), which is a medical "practice" that was not under the control and direction of Stybel, but rather, was at all relevant times operated, managed, and controlled by the Testing Defendants (defined below), the Laundering Defendants (defined below), and the John Doe Defendants (as defined below) for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers;

> (ii)    the Fraudulent Services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements established between Stybel, the Stybel Practice, the Testing Defendants, the Laundering Defendants, and the Clinics (as defined below);

> (iii)   the Fraudulent Services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols

2

designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds;

(iv)    the claim submissions seeking payment for the Fraudulent Services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided to Insureds; and

(v)    the Fraudulent Services, to the extent provided at all, were not provided by Stybel or any other licensed physician, but rather by persons who were unlicensed, and were neither directly supervised by Stybel nor employed by her or the Stybel Practice.

3.    Stybel is a New York physician who purports to own and operate a medical "practice" under a sole proprietorship using Tax Identification Number 55-086xxxx (the "Stybel Practice") (collectively with Stybel, the "Stybel Defendants"), and purports to have used that medical "practice" to provide ESWT to more than six-hundred sixty (660) GEICO Insureds in a period of less than ninety (90) days.

4.    In fact, the Stybel Defendants, in combination with (i) Mironovich, NY Billing, Evergreen and the John Doe Defendants (collectively, the "Testing Defendants") and (ii) Meladze, Blue Tech, and Sunstone (collectively, the "Laundering Defendants"), engaged in a massive fraudulent insurance scheme against GEICO and the New York automobile insurance industry in which they billed GEICO alone more than $2.5 million for the alleged performance of the Fraudulent Services at more than thirty-five (35) separate locations from July 1, 2021 to September 25, 2021.

5.    Notably, more than 1,300 claim submissions were made to GEICO over a period of just a few short months seeking payment of no-fault benefits for the Fraudulent Services, all of which represented that Stybel was the legitimate owner of the Stybel Practice and that she allegedly performed all the Fraudulent Services.

6.    In truth, Stybel performed none of the Fraudulent Services and did not legitimately own, operate, manage, or control the Stybel Practice.

7.      In or about 2021, the Defendants engineered this fraudulent scheme on the heels of material changes adopted by the New York Department of Financial Services regarding the application of the New York Workers Compensation Fee Schedule ("Fee Schedule") to New York's no-fault reimbursement. Those changes eliminated billing abuses and fraudulent treatment practices that had plagued the automobile insurance industry for more than a decade by, among other things, (i) making many services that had been historically abused either ineligible for reimbursement or subject to reduced reimbursement, (ii) limiting chiropractor billing to CPT codes in the chiropractic section of the fee schedule, and (iii) controlling reimbursement among providers who rendered concurrent care to patients by establishing daily reimbursement limits for all related disciplines.

8.      In contrast to these changes, the Fee Schedule changes did not materially alter reimbursement for performance of the Fraudulent Services and, importantly, for the first time, established a definitive rate of reimbursement of approximately $700.00 for performance of ESWT, which has historically been a Category III Code (0101T) with a "BR" designation, meaning that definitive reimbursement had not previously been established. Prior to October 2020, ESWT was virtually never performed on automobile accident patients or billed to automobile insurers, in part because of the lack of established reimbursement and because – if properly performed – service required considerable investment, including direct involvement by a physician in the performance of the service and the use of physical equipment that is very costly and is not typically portable.

9.      Defendants seized on these changes in the Fee Schedule (or lack thereof). The Stybel Defendants in association with the Testing Defendants and the Laundering Defendants, concocted a fraudulent treatment and billing scheme pursuant to which:

(i)     Stybel would allow the Testing Defendants, the Laundering Defendants, and the John Doe Defendants to use her New York license and the tax identification number of the Stybel Practice to submit fraudulent billing to GEICO and other New York automobile insurers;

(ii)    unlicensed "technicians" would be engaged and directed by Mironovich to render the Fraudulent Services on an itinerant basis at a large number of multidisciplinary clinics located throughout the New York metropolitan area that purported to provide treatment to patients with no-fault insurance, but which in actuality were organized to supply convenient, one-stop shops for no-fault insurance fraud (the "Clinics");

(iii)   the unlicensed "technicians" would then generate falsified reports to create a false justification for the performance of the medically unnecessary and illusory Fraudulent Services and send them back to the Testing Defendants; and

(iv)    the reports, documents, and bills for thousands of dollars per patient per date of treatment would be submitted to New York automobile insurance companies, including GEICO, falsely representing that the Fraudulent Services were performed by Stybel and seeking payment for their performance.

10.     To facilitate the fraudulent scheme, the Defendants used a series of shell companies, including but not limited to Evergreen, Blue Tech, and Sunstone, to conceal their identities and involvement in the scheme, to illegally siphon the profits from the Stybel Practice, convert millions of dollars into cash, and to pay various "tech" companies to provide unlicensed technicians at the Clinics to provide the Fraudulent Services with full knowledge that the Fraudulent Services, even if medically appropriate, would need to be provided by licensed healthcare providers to be reimbursable.

11.      The success of the fraudulent scheme required substantial coordination between the Defendants.  In furtherance of the fraudulent scheme, Stybel allowed the Testing Defendants the Laundering Defendants and the John Doe Defendants, in exchange for a nominal payment, to use her name, medical license and the Stybel Practice to "fund" the Fraudulent Services, engage

New York collection lawyers and bill GEICO and other New York automobile insurance companies for the alleged performance of the Fraudulent Services.

12.     Once the information was acquired, the Testing Defendants and the John Doe Defendants used Stybel's information to (i) generate false and fraudulent documents, including NF-3 forms (i.e., bills), assignment of benefit ("AOB") forms, and medical records; and (ii) operate and control the Stybel Practice as a fictional healthcare "practice" to serve as a vehicle through which millions of dollars of billing for the Fraudulent Services could be submitted to GEICO and other New York automobile insurers.

13.     The Testing Defendants in association with the Laundering Defendants also used Stybel's information and signature to create false "funding" arrangements to fuel the fraudulent scheme and to hide their participation.

14.     Because the Stybel Practice was nothing more than a shell to hide the participation of the Testing Defendants, Laundering Defendants and John Doe Defendants' participation in the scheme, it was critical to the success of the fraudulent scheme for the Defendants to partner with New York collection attorneys to create an appearance of legitimacy by:

(i)      purporting to represent the physician and the billing entity;

(ii)     providing for or facilitating "funding" (i.e., financing against receivables) of the fraudulent billing to be submitted to GEICO and other New York insurers in connection with the unlawful scheme through companies in which the attorney/law firms either owned or with whom they had relationships;

(iii)    pursuing payment and collection against GEICO and other New York automobile insurers by knowingly (a) submitting fraudulent bills to the insurers for the Fraudulent Services, and (b) pursuing collection lawsuits and/or arbitrations seeking payment on the claims that were denied or claimed to have been improperly paid; and

(iv)     accepting the insurance payments received from automobile insurers through their attorney IOLA/Trust accounts, and then distributing the payments to themselves and other third parties.

15.     At the time, the Testing Defendants had an ongoing relationship with several collection attorneys and had in their possession copies of documents used by the collection lawyers that would be needed to facilitate the funding (i.e., the securing of advances against the claims) and the billing and collections on the fraudulent claims, including documents such as retainer letters, payment directives, and funding agreements.

16.     As part of the coordination with Stybel and the Laundering Defendants, the Testing Defendants and the John Doe Defendants contacted two New York law firms to provide billing and collection services on behalf of the Stybel Practice in relation to the fraudulent claims.  Those law firms were (i) Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara, Wolf, & Carone, L.L.P. ("Abrams Fensterman"); and (ii) Gabriel & Moroff, P.C. ("Gabriel Moroff") (collectively, the "Collection Lawyers").

17.     In addition to arranging to have Abrams Fensterman represent Stybel and the Stybel Practice in relation to the billing and collection of the fraudulent claims, the Testing Defendants and the John Doe Defendants also arranged for the fraudulent claims to be funded through a "funding company" that was one of many that was associated with the law firm, formed as a Delaware limited liability company, and known as Financial Vision Capital Group 2, LLC ("Financial Vision").

18.     From the inception of the fraudulent scheme and thereafter, Mironovich and NY Billing communicated with Esther Gadayeva, the Billing Manager and Paralegal at Abrams Fensterman, directing how to distribute the "advances" that were related to each "batch" of the Stybel Practice's fraudulent claims, and directed the law firm to send the vast majority of the funds to Blue Tech and Sunstone.

19.     Furthermore, in arranging to have Gabriel Moroff represent Stybel and the Stybel Practice in relation to the billing and collection of the fraudulent claims, the Testing Defendants and the John Doe Defendants arranged for that portion of the Stybel Practice's fraudulent claims to be funded by a New York limited liability company known as Family Fund Capital LLC ("Family Fund").  Family Fund was formed in 2021, and one of a series of shell companies that is owned on paper by an elderly woman, but which is actually a front for an individual that previously went to jail for insurance fraud. (Family Fund and Financial Vision are hereinafter collectively known as the "Funders").

20.     Once the funding relationships were in place, the information Stybel provided to the Testing Defendants and the John Doe Defendants was then used by them to manufacture: (i) the claim documents necessary to support the fraudulent claim submissions, including the AOB forms and other medical records, (ii) the engagement letter and associated documents needed by the Collection Lawyers to bill and collect on the Fraudulent Services, and (iii) the funding agreements to present to the Funders.  Once the documents were in place with the Funders, the Funders began transferring money to the Laundering Defendants as "advances" against the claims for the Fraudulent Services.  Neither the Testing Defendants, the John Doe Defendants nor the Laundering Defendants were signatories to the funding agreements, but they received the money without risk, and used the payments received from the Funders for their own benefit, as well as to pay individuals and entities to perpetuate the fraudulent scheme.

21.     The Testing Defendants and the John Doe Defendants provided the package of documents associated with billing, collection, and funding efforts to the Collection Lawyers and thereafter, began to transfer fabricated claim documents.  Once the documents were processed by the Collection Lawyers and/or billing companies with whom they associated into bills (i.e., "NF-

3" forms) using the name of the Stybel Practice, the Collection Lawyers organized the claim submissions and mailed them to GEICO and other insurance companies seeking payment. The Collection Lawyers:

(i) purported to represent Stybel and the Stybel Practice in thousands of writings sent to GEICO;

(ii) arranged and/or interfaced to effectuate the "funding" of the bills that were submitted to GEICO and other New York insurers in the name of the Stybel Practice;

(iii) systemically pursued payment and collection against GEICO and other New York automobile insurers on behalf of the Stybel Practice; and

(iv) collected insurance payments from GEICO and other New York automobile insurers and deposited those payments into their IOLA/Trust Accounts.

22. The billings mailed by the Collection Lawyers in the name of Stybel and the Stybel Practice to GEICO alone represented an impossible amount of healthcare services claimed to have been performed by Stybel in the identified time frame:

| Collection Lawyer | Date of Service Range | Date of Mailing Range | Total Bills Submitted | Total Billing |
|---|---|---|---|---|
| Abrams Fensterman | July 1, 2021 to September 25, 2021 (85 days) | July 26, 2021 to October 25, 2021 (91 Days) | 1,230 | $2,304,982.67 |
| Gabriel Moroff | August 26, 2021 to September 13, 2021 (17 Days) | October 11, 2021 to October 18, 2021(7 Days) | 132 | $238,696.46 |

23. The Testing Defendants and John Defendants were also able to create and implement the fraudulent scheme because Mironovich is a "processor" within the no-fault industry who – through coordinating and conspiring with the John Doe Defendants – earns money by: (i) establishing relationships with laypersons that are associated with the Clinics, (ii) collecting the no-fault claims (i.e. the paperwork) from the Clinics for services that are allegedly provided to individuals covered by no-fault insurance, (iii) securing the funding on the claims to be billed to

the insurance companies, and (iv) referring the no-fault billing and collection work to New York collection lawyers, including the Collection Lawyers.

24.     Indeed, the funding relationships established with the Funders and Collection Lawyers was designed to: (i) fuel the fraudulent scheme, (ii) conceal the participation of the Testing Defendants, Laundering Defendants and the John Doe Defendants in the scheme, (iii) disproportionately benefit the Testing Defendants, Laundering Defendants and the John Doe Defendants, and (iv) allow for the control of the "assets" of the "practice" to remain in the hands of persons other than the licensed physician.  For example, the funding agreements, financial transactions, and flow of funds were structured so that:

- The advances made by the Funders never passed through the Stybel Practice (which never had a bank account) as they were predominately paid over to third-parties or laundered through the IOLA accounts of the Collection Lawyers;

- The Funders would advance between 35% and 40% on the "face value" of the fraudulent claims, and thereafter take control of the billing and collection through the captive arrangements with the Collection Lawyers; and

- There would never be any money actually payable to the Stybel Practice based on the actual collections, because the Funders charged exorbitant fees and interest rates, and the Collection Lawyers also received a share of the collections.

25.     As part of the scheme, the Testing Defendants and the John Doe Defendants established illegal referral and kickback arrangements with the owners and/or managers of the Clinics to allow the Defendants to access a steady stream of patients to be able to fraudulently bill GEICO and other automobile insurers, and exploit New York's no-fault insurance system for financial gain without regard to genuine patient care.  The Testing Defendants and the John Doe Defendants also established relationships with companies such as Trydat, Inc., Romgo Tech Service, Inc. and Seaview Services, Inc. (the "Tech Companies") to provide unlicensed technicians

to perform the Fraudulent Services at the Clinics at the direction of Mironovich, the other Testing Defendants and the John Doe Defendants.

26. The flow of funds associated with the present scheme illustrates its fraudulent nature:

- Approximately $1,900,000.00 in advances were paid by the Funders and the Collection Lawyers to the Laundering Defendants based on the advances made on the Stybel Practice's fraudulent claims;

- The Laundering Defendants, in turn, transferred the money along with $8,000,000.00 in additional funds to a jeweler in New York City so that it could be further laundered and converted to cash and other untraceable assets;

- That money was then used by the Testing Defendants to support the illegal referral and kickback arrangements with the owners and/or managers of the Clinics and to illegally siphon the profits of the Stybel Practice to themselves and to others;

- A small amount of money beyond the $1,900,000.00 in advances on the fraudulent claims, associated with the Stybel Practice's percentage of the advances, were paid to: (i) Stybel, in exchange for allowing her license and name to be used and (ii) Evergreen, so that the Tech Companies could be paid; and

- The money received from the insurance companies were all deposited by the Collection Lawyers into their IOLA Accounts and paid to themselves and the Funders.

27. As discussed herein, the Defendants at all relevant times have known that: (i) Stybel was not in the control of the Stybel Practice, which was operated, managed and controlled by the Testing Defendants, Laundering Defendants and John Doe Defendants for purposes of effectuating a large scale insurance fraud scheme, (ii) the Fraudulent Services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons and as a result of illegal financial arrangements between the Defendants and the Clinics, (iii) the Fraudulent Services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the

Insureds, and (iv) the Fraudulent Services, to the extent provided at all, were never performed by Stybel or by any other licensed physician but by persons who were never supervised by Stybel or employed by the Stybel Practice. The chart annexed hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that the Defendants submitted, or caused to be submitted, to GEICO.

28. Defendants do not now have – and never had – any right to be compensated for or to realize any economic benefit from the Fraudulent Services that they billed to GEICO.

29. Defendants' fraudulent scheme began in 2021 and has continued uninterrupted through the present day as Defendants continue to seek collection on pending charges for the Fraudulent Services. As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $1,455,000.00.

## THE PARTIES

### I.    Plaintiffs

30. Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.    Defendants

31. Defendant Stybel resides in and is a citizen of New York. Stybel is a physician licensed to practice medicine, and agreed to allow for the formation of the Stybel Practice and to "front" as its owner, while allowing the Testing Defendants and the Laundering Defendants to use her license and the Stybel Practice as a billing "vehicle", as part of the fraudulent scheme committed against GEICO and other New York automobile insurers.

32.     Defendant Stybel Practice is a New York sole proprietorship that lists its principal place of business as 3063 Brighton 8th Street, Floor 2, Brooklyn, New York (the "8th Street Location").

33.     Defendant Evergreen is a New York limited liability corporation that lists its principal place of business as 100 West Oak Street, Amityville, New York, the same location as Stybel's small family practice, "Amityville Family Practice." Stybel is the sole member of Evergreen.

34.     Defendant Mironovich resides in and is a citizen of New York.

35.     Defendant NY Billing is a New York corporation with its principal place of business in New York. Defendant Mironovich is the corporation's owner and sole shareholder.

36.     Defendant Meladze resides in and is a citizen of New York. In 2008, Meladze pled guilty to Conspiracy to Distribute Controlled Substance (Oxycontin) and was sentenced to 57 months in prison followed by three years supervised release. See USA v. Meladze et al., 2:07-cr-00070-wks-1.

37.     Defendant Blue Tech is a New York corporation with its principal place of business in New York. Blue Tech is owned by Meladze.

38.     Defendant Sunstone is a New York corporation with its principal place of business in New York. Sunstone is owned by Meladze.

39.     John Doe Defendants are citizens of New York. John Doe Defendants are unlicensed, non-professional individuals and entities, presently not identifiable to GEICO, who knowingly participated in the fraudulent scheme with the Stybel Defendants, the Testing Defendants, and the Laundering Defendants by: (i) unlawfully owning, operating, managing and controlling the Stybel Practice, (ii) establishing relationships with the laypersons associated with

the Clinics, (iii) collecting the no-fault claims (i.e., the paperwork) from the Clinics for the Fraudulent Services, (iv) arranging for and providing the funding associated with the Fraudulent Services; (v) referring the no-fault billing and collection work associated with the Fraudulent Services to New York collection lawyers, including the Collection Lawyers; and (vi) coordinating with Mironovich on how to siphon the virtually all of the profits of the Stybel Practice to the Laundering Defendants.

## JURISDICTION AND VENUE

40. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states. This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

41. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

42. Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

43. GEICO underwrites automobile insurance in New York.

## I. An Overview of the Pertinent Law Governing No-Fault Reimbursement

44. New York's no-fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§

5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

45.  No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses incurred for health care goods and services, including medical services.

46.  An Insured can assign his/her right to No-Fault Benefits to health care goods and services providers in exchange for those services.

47.  Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3"). In the alternative, a health care provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

48.  Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

49.  The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York …. (Emphasis added).

50.  In New York, only a licensed physician may: (i) practice medicine; (ii) own or control a medical professional corporation; (iii) employ and supervise other physicians; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

51.     Unlicensed non-physicians may <u>not</u>: (i) practice medicine; (ii) own or control a medical professional corporation; (iii) employ and supervise other physicians; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

52.     New York law prohibits licensed healthcare services providers, including physicians, from paying or accepting kickbacks in exchange for patient referrals.  <u>See, e.g.</u>, New York Education Law §§ 6509-a; 6530(18); and 6531.

53.     New York law prohibits unlicensed persons not authorized to practice a profession, like medicine, from practicing the profession and from sharing in the fees for professional services. <u>See, e.g.</u>, New York Education Law § 6512, § 6530(11), and (19).

54.     Therefore, under the No-Fault Laws, a health care provider is not eligible to receive No-Fault Benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in exchange for patient referrals if it permits unlicensed laypersons to control or dictate the treatments or allows unlicensed laypersons to share in the fees for the professional services.

55.     In <u>State Farm Mut. Auto. Ins. Co. v. Mallela</u>, 4 N.Y.3d 313, 320 (2005) and <u>Andrew Carothers, M.D., P.C. v. Progressive Ins. Co</u>., 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that: (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits; and (ii) only licensed physicians may practice medicine in New York because of the concern that unlicensed physicians are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

56.     Pursuant to the No-Fault Laws, only health care providers in possession of a <u>direct</u> assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or

his/her health care provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits <u>directly</u> to providers of health care services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

57.     Accordingly, for a health care provider to be eligible to bill for and to collect charges from an insurer for health care services pursuant to Insurance Law § 5102(a), it must be the actual provider of the services. Under the No-Fault Laws, a professional corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

58.     In New York, claims for PIP Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

59.     When a healthcare services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

60.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a health care provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.    Defendants' Fraudulent Scheme

### A.    Stybel and Her Recruitment

61.    Stybel is a Doctor of Osteopathic Medicine and became licensed to practice medicine in New York in 2002.  According to public record searches, Stybel operates a small family practice under the name "Amityville Family Practice" in Suffolk County from the following location on 100 West Oak Street in Amityville, New York:



62.    In contrast to her family practice, the Stybel Practice represented that it operated from the 8th Street Location.

63.    The 8th Street Location does not publicly associate to Stybel in any manner.  Rather, the 8th Street Location identifies solely with Mironovich and NY Billing, as well as a practice known as Chiropractic Wellness Center and Alex Khait, D.C. ("Khait"), a New York chiropractor. Khait is no stranger to no-fault insurance schemes and was previously named as a defendant by GEICO in a federal lawsuit entitled Government Employees Insurance Company, et al. v. Alex Khait, et al., 1:17-cv-1881-PKC-SJB (E.D.N.Y. 2017) ("GEICO v. Khait").  In that lawsuit it was revealed that:

(i)     Khait's entities issued tens of thousands of dollars in checks to fictitious entities that were also paid by Tea Kaganovich ("Kaganovich") and Ramazi Mitaishvili ("Mitaishvili"), two individuals who, while pleading guilty to health care fraud, admitted to paying approximately $18.5 million in kickbacks for the referral of patients to their diagnostic testing facilities in Brooklyn, Queens, and the Bronx. United States of America v. Tea Kaganovich, Ramazi Mitaishvili, 17-CR-00649 (E.D.N.Y. 2019). Both Kaganovich and Mitaishvili invoked their Fifth Amendment privilege against self-incrimination in a civil action when asked whether they had issued checks to certain sham companies as payments in exchange for patient referrals; and

(ii)    Khait's entities had received a large number of checks that were illegally exchanged for cash at a check-cashing facility in New Jersey – Cambridge Clarendon Financial Service, LLC d/b/a United Check Cashing ("Cambridge Clarendon"). Virtually all of these checks were exchanged for cash by an individual named Alla Kuratova ("Kuratova"), who was previously indicted for recruiting individuals to act as phony patients in connection with an illegal prescription drug trafficking ring, and from approximately May 2017 through May 2021, Kuratova illegally exchanged over $35 million worth of checks, made out to over 1,000 different companies, for cash at Cambridge Clarendon.

64.    Stybel is also familiar with illegal kickback and patient referral relationships. Prior to the establishment of the Stybel Practice, Stybel had formed several other medical professional corporations, including Downstate Medical Care, P.C., EPS Medical, P.C., and Interstate Medical Care, P.C. that billed for the performance of healthcare services. Like the Khait entities, checks issued to Stybel's other professional corporations were also illegally exchanged for cash at Cambridge Clarendon by Kuratova. For example, between September 2018 and April 2019, Kuratova cashed multiple checks written to two of Stybel's professional corporations, EPS Medical, P.C. and Interstate Medical Care, P.C., for no legitimate purpose.

65.    In 2021, Stybel was recruited by Mironovich and the John Doe Defendants to participate in a complex insurance fraudulent scheme to bill GEICO and other New York automobile insurers millions of dollars for medically unnecessary, experimental, and otherwise reimbursable services.

66. Based on the arrangement, Stybel would receive a periodic payment in exchange for allowing her name, license, and the tax identification number of the Stybel Practice to be used by the Testing Defendants, John Doe Defendants, and the Laundering Defendants, and Stybel would contend that she supervised the Fraudulent Services if any insurance company ever inquired. At the time, Stybel was a perfect candidate for the fraudulent scheme because (i) she was familiar with no-fault billing and kickback schemes that had involved her prior professional corporations, and (ii) was in significant financial debt, with over $261,000.00 in outstanding judgments against her and her Suffolk-based private practice.

**B.      Gaining Access to Insureds**

67. The Stybel Practice had no legitimate indicia. It had no fixed treatment locations of any kind, did not maintain a stand-alone practice, was not the owner or leaseholder in any of the real property from which it purported to provide the Fraudulent Services, did not employ its own support staff, and did not advertise or market its services to the general public.

68. In fact, the Testing Defendants, John Doe Defendants, and the Laundering Defendants controlled the fraudulent scheme by using the name of Stybel and the Stybel Practice on an itinerant basis in connection with the performance of the Fraudulent Services from more than thirty-five (35) separate Clinics, primarily located in Brooklyn, Queens, and Bronx, where they were given access to steady volumes of patients pursuant to the unlawful referral arrangement, including the following:

| Clinic - Street Address | Clinic – Borough |
|---|---|
| 1110 Pelham Parkway | Bronx |
| 150 Graham Avenue | Brooklyn |
| 1611 E New York Avenue | Brooklyn |
| 1568 Ralph Avenue | Brooklyn |
| 2088 Flatbush Avenue | Brooklyn |
| 717 Southern Boulevard | Bronx |

| Clinic - Street Address | Clinic – Borough |
|---|---|
| 282-284 Avenue X | Brooklyn |
| 430 W Merrick Road | Valley Stream |
| 3000 Eastchester Road | Bronx |
| 79-45 Metropolitan Avenue | Queens |
| 611 East 76th Street | Brooklyn |
| 219-16 Linden Boulevard | Queens |
| 175 Fulton Avenue | Hempstead |
| 488 Lafayette Avenue | Brooklyn |
| 647 Bryant Avenue | Bronx |
| 332 E 149th Street | Bronx |
| 2386 Jerome Avenue | Bronx |
| 4250 White Plains Road | Bronx |
| 1894 Eastchester Road | Bronx |
| 4014A Boston Road | Bronx |
| 62-69 99th Street | Queens |
| 3626 E Tremont Avenue | Bronx |
| 176 Wilson Avenue | Brooklyn |
| 2273 65th Street | Brooklyn |
| 1655 Richmond Avenue | Staten Island |

69.     To obtain access to the Clinics' patient base (i.e., the Insureds), the Defendants entered into illegal financial and kickback arrangements with the unlicensed persons who controlled the Clinics, who provided access to the patients that were treated, or who purported to be treated, at the Clinics.

70.     Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, the Clinics, in actuality, were organized to supply "one-stop" shops for no-fault insurance fraud.

71.     Clinics provided facilities for the Stybel Defendants and the Testing Defendants, as well as a "revolving door" of healthcare services professional corporations, chiropractic professional corporations, physical therapy professional corporations, and/or a multitude of other purported healthcare providers, all geared towards exploiting New York's no-fault insurance system.

72.     In fact, GEICO received billing from an ever-changing number of fraudulent healthcare providers at many of the Clinics, starting and stopping operations without any purchase or sale of a "practice", without any legitimate transfer of patient care from one professional to another, and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

73.     For example:

(i)     GEICO has received billing for purported healthcare services rendered at the Clinic located at 717 Southern Boulevard, Bronx, New York, from a revolving door of more than one hundred seventy (170) purportedly different healthcare providers;

(ii)     GEICO also received billing for purported healthcare services rendered at the Clinic located at 1568 Ralph Avenue, Brooklyn, New York, from a revolving door of more than one hundred (100) purportedly different healthcare providers; and

(iii)     GEICO also received billing for purported healthcare services rendered at the Clinic located at 1894 Eastchester Road, Bronx, New York, and the Clinic located at 1110 Pelham Parkway, Bronx, New York, from a revolving door of more than ninety (90) purportedly different healthcare providers at each Clinic.

74.     Furthermore, some of the Clinics where the Stybel Defendants purportedly provided Fraudulent Services to Insureds include locations that have been the subject of a recent indictment involving numerous individuals who allegedly paid monies to hospitals, medical

providers and others for confidential patient information, and the patients would be contacted and "referred" for medical treatment from a select network of medical clinics (and lawyers) in New York and New Jersey that paid kickbacks to the indicted individuals. See United States of America v. Anthony Rose, et al., 19-cr-00789(PGG)(SDNY 2019).

75.     Clinics willingly provided access to the Stybel Defendants and the Testing Defendants in exchange for kickbacks and other financial incentives, because the Clinics were facilities that sought to profit from the "treatment" of individuals covered by no-fault insurance and, therefore, catered to high volumes of Insureds at the locations.

76.     In general, the referral sources at the Clinics were paid a sum of money in untraceable cash or payments typically disguised as "rent".  They were in reality, kickbacks for referrals, and the relationship was a "pay-to-play" arrangement. In connection with this arrangement, when an Insured visited one of the Clinics, he or she was automatically referred by one of the Clinic's "representatives" for the performance of the Fraudulent Services.

77.     In keeping with the fact that the Clinics controlled the patient base and that the Stybel Practice was simply one of several interchangeable "cogs" in the fraud wheel, there were numerous instances between July 2021 and September 2021 where the Stybel Practice was (i) allegedly providing the Fraudulent Services on Insureds at a Clinic location at the same time that other medical practices were performing the Fraudulent Services on Insureds, and (ii) was one of numerous "providers" rendering the Fraudulent Services at specific Clinic locations in alternating weekly sequences.

78.     Clinic "representatives" typically making the referrals were receptionists or some other non-medical personnel who simply directed or "steered" the Insureds to whichever practice

was being given access to the Insureds on a given day pursuant to the unlawful payment and referral arrangement.

### C. Defendants Place the Fraudulent Scheme in Motion

79.    Once all the necessary "pieces" were in place and Stybel had turned control over to the Testing Defendants and the Laundering Defendants, the fraudulent scheme was placed into overdrive.

80.    The Testing Defendants and the Laundering Defendants began to illegally operate and manage the Stybel Practice and implemented the fraudulent billing and treatment scheme using a "quick hit" strategy, billing GEICO and other New York automobile insurers millions of dollars for the performance of the Fraudulent Services in a matter of months, thereby attempting to limit the insurance companies' ability to investigate and address the scheme.

81.    In furtherance of the fraudulent scheme, the Defendants took other actions, including:

(i)    the Testing Defendants and John Doe Defendants exploited their financial relationships with the Clinics to gain access to Insureds who were being treated at the locations and arranged to have technicians visit the Clinics to perform the Fraudulent Services on Insureds; and

(ii)   the Testing Defendants and the Laundering Defendants arranged to have the fraudulent insurance billings that were to be submitted to GEICO and other New York automobile companies seeking payment for the Fraudulent Services "funded" through the Funders to siphon the profits of the Stybel Practice to Blue Tech and Sunstone's bank accounts.

82.    To facilitate the scheme and allow the account receivables associated with the GEICO billings for the Fraudulent Services to be "funded" through the Funders, the Testing Defendants, the John Doe Defendants, and the Laundering Defendants, with the assistance of the Collection Lawyers, arranged for documents to be signed, directing the payments to be made to the Laundering Defendants and other third parties rather than Stybel.

83.     The purpose of the funding agreements was to create the appearance that there were legitimate financing or factoring agreements associated with the fraudulent billing when, in fact, the true purpose was to allow the Testing Defendants, the John Doe Defendants and the Laundering Defendants to get paid up front. In fact, the fraudulent funding agreements allowed the Funders to charge exorbitant interest rates and other fees against the "advances" that were to be made against the fraudulent billing as a financial reward for the risk that they were taking to fund the fraudulent scheme and willingness to pay the advances to persons other than Stybel and the Stybel Practice

84.     As a result of those efforts, the Testing Defendants, John Doe Defendants and Laundering Defendants arranged to receive more than $2,000,000.00 in advances on the claims for the Fraudulent Services from the Funders without any risk, because they were never signatories to the agreements.  For example, Mironovich and NY Billing would e-mail Abrams Fensterman on a daily/weekly basis with instructions on where to wire the funding relating to the Stybel Practice, with the vast majority of the funds going to Blue Tech and Sunstone's bank accounts. Once Abrams Fensterman received the e-mail from Mironovich and NY Billing, the law firm wired the funds from the law firms' bank account to Blue Tech, Sunstone, and in limited instances, to the Evergreen bank account held by Stybel.

85.     The bank account for Evergreen was established so that (i) Stybel could receive funds that represented the payment to her for illegally allowing the Testing Defendants and the Laundering Defendants to use her name and medical license and to own and control the Stybel Practice; and (ii) payments for purported expenses of the Stybel Practice, including payments to the Tech Companies that provided the unlicensed independent contractor technicians who purportedly provided the Fraudulent Services.

86.     Once the advances were received, the Testing Defendants, the John Doe Defendants and the Laundering Defendants had the Collection Lawyers begin billing GEICO and other New York automobile insurers for the Fraudulent Services.  In furtherance of this scheme, from July 26, 2021 through October 31, 2021 (during a period of approximately 90 days), GEICO received through the United States mail, bills, AOBs, and other records from the Defendants (including through the Collection Lawyers) with respect to more than 1,300 bills involving more than 660 separate patients and seeking payment of more than $2.5 million.

87.     Each of the claims was accompanied by a letter from the Collection Lawyers, representing that they were legal counsel to Stybel and the Stybel Practice in connection with the collection of charges from GEICO for the performance of the Fraudulent Services.

88.     Through the funding and collection arrangements, the Testing Defendants, John Doe Defendants, and the Laundering Defendants controlled the Stybel Practice and were able to realize an immediate financial benefit.  The Funders were compensated through the insurance payments and the Collection Lawyers (in turn) would be compensated through the payment of other monies from the insurance companies, including legal fees associated with the collections as well as interest and other charges to be repaid from the collections on the claims for the Fraudulent Services.

**D.      The Fraudulent Billing and Treatment Protocols Employed by the Defendants**

89.     The Fraudulent Services billed in the name of the Stybel Practice were not medically necessary and were provided, to the extent provided at all, pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds.  The Fraudulent Services were further provided pursuant to the

dictates of unlicensed laypersons not permitted by law to render or control the provision of healthcare services.

90.    Neither Stybel nor any other licensed physicians were ever involved in the performance of the Fraudulent Services.  In fact, unlicensed laypersons rather than any healthcare professionals working in the Clinics developed and controlled the patient base at the Clinics.  Once they were given access, the Testing Defendants and the Laundering Defendants arranged to have Insureds at the Clinics subjected to the Fraudulent Services by unlicensed technicians that they controlled, despite there being no clinical basis for the services, and submit to purported therapy services that were experimental and investigational, among other things, all solely to maximize profits without regard to genuine patient care.

91.    In fact, there was no physician involvement with the performance of any of the Fraudulent Services and the only point in having the Insureds seen by the unlicensed technicians was to get the patient's signature on a piece of paper so that the Testing Defendants and the Laundering Defendants could get money from the Funders and transmit the claims to the Collection Lawyers, so that they could generate bills and submit them to GEICO seeking payment for the Fraudulent Services to earn their compensation.

92.    Regardless of the nature of the accidents or the actual medical needs of the Insureds, the Defendants purported to subject virtually every Insured to a pre-determined fraudulent treatment protocol without regard for the Insureds' individual symptoms or presentment.  Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

93.     No legitimate physician or other licensed healthcare provider would permit the fraudulent treatment and billing protocol described below to proceed under his or her auspices. This conclusion is reinforced by the fact that there was no physician involvement in any of the Fraudulent Services allegedly performed on Insureds and billed to GEICO.

**1.      The Fraudulent Charges for "Extracorporeal Shockwave Therapy"**

94.     Defendants purported to systemically subject Insureds to medically unnecessary ESWT "treatments".  In keeping with the fact that the Defendants intended to conceal the absence of any physician involvement and that the Stybel Practice was just one of several billing entities that they used, the Testing Defendants arranged to have the services documented on a generic "form" that intentionally avoided referencing Stybel or the Stybel Practice.  The following is a representative example:



95.     Of consequence, the "notes" associated with the ESWT "treatments" never identified who actually performed the service, but the claims that were submitted to GEICO by the

Defendants included an NF-3 form that falsely represented that Stybel performed the actual service:

FRANCHESCA SYNSMIR-81-FA69

**VERIFICATION OF TREATMENT BY ATTENDING PHYSICIAN OR OTHER PROVIDER OF HEALTH SERVICE**
**PAGE 3**

16. IF TREATING PROVIDER IS DIFFERENT THAN BILLING PROVIDER COMPLETE THE FOLLOWING:

| TREATING PROVIDER'S NAME | TITLE | LICENSE OR CERTIFICATION NO | BUSINESS RELATIONSHIP CHECK APPLICABLE BOX | | |
|---|---|---|---|---|---|
| | | | EMPLOYEE | INDEPENDENT CONTRACTOR | OTHER (SPECIFY) |
| Elena Borisovna Stybel | MD | Lic # 224376 | No | | |
| | | | | | |
| | | | | | |

17 IF THE PROVIDER OF SERVICE IS A PROFESSIONAL SERVICE CORPORATION OR DOING BUSINESS UNDER AN ASSUMED NAME (DBA), LIST THE OWNER AND PROFESSIONAL LICENSING CREDENTIALS OF ALL OWNERS (Provide an additional attachment if necessary).

Elena Borisovna Stybel  224376  OWNER

| 18. IS PATIENT STILL UNDER YOUR CARE FOR THIS CONDITION? | YES ☐ | NO ☐ |
|---|---|---|

19. ESTIMATED DURATION OF FUTURE TREATMENT

Not Determined at this time

96.     The billing data associated with the claims submissions made to GEICO corroborates the fraudulent nature of the billing/treatment protocols.  According to the billing, the ESWT "treatment" alleged to have been performed on Insureds between July 1, 2021 to September 25, 2021(less than 90 days) purported that:  (i) more than 1,300 separate dates of service were performed; (ii) the service was performed on at least 660 separate patients; (iii) the service was performed at more than thirty five (35) separate locations; and (iv) the services were provided at multiple locations at the same day, with multiple instances including ten (10) or more separate treatment locations on some days.

97.     Once documented by the unidentified technicians, the Defendants then billed GEICO for the performance of ESWT using the tax identification associated with the Stybel Practice using CPT code 0101T.

**CATEGORY III CODES**                                              **0042T–0504T**
**Medical Fee Schedule**                                            **Effective April 1, 2019**

| | | Code | Description | Relative Value | FUD | PC/TC Split |
|---|---|---|---|---|---|---|
| ■ | | 0042T | Cerebral perfusion analysis using computed tomography with contrast administration, including post-processing of parametric maps with determination of cerebral blood flow, cerebral blood volume, and mean transit time | 15.44 | XXX | |
| ■ | + | 0054T | Computer-assisted musculoskeletal surgical navigational orthopedic procedure, with image-guidance based on fluoroscopic images (List separately in addition to code for primary procedure) | 2.47 | XXX | |
| ■ | + | 0055T | Computer-assisted musculoskeletal surgical navigational orthopedic procedure, with image-guidance based on CT/MRI images (List separately in addition to code for primary procedure) | 3.23 | XXX | |
| | | 0058T | Cryopreservation; reproductive tissue, ovarian | BR | XXX | |
| | | 0071T | Focused ultrasound ablation of uterine leiomyomata, including MR guidance; total leiomyomata volume less than 200 cc of tissue | BR | XXX | |
| | | 0072T | Focused ultrasound ablation of uterine leiomyomata, including MR guidance; total leiomyomata volume greater or equal to 200 cc of tissue | BR | XXX | |
| ■ | | 0075T | Transcatheter placement of extracranial vertebral artery stent(s), including radiologic supervision and interpretation, open or percutaneous; initial vessel | 18.68 | XXX | |
| ■ | + | 0076T | Transcatheter placement of extracranial vertebral artery stent(s), including radiologic supervision and interpretation, open or percutaneous; each additional vessel (List separately in addition to code for primary procedure) | 17.50 | XXX | |
| | | 0085T | Breath test for heart transplant rejection | BR | XXX | |
| | + | 0095T | Removal of total disc arthroplasty (artificial disc), anterior approach, each additional interspace, cervical (List separately in addition to code for primary procedure) | BR | XXX | |
| | + | 0098T | Revision including replacement of total disc arthroplasty (artificial disc), anterior approach, each additional interspace, cervical (List separately in addition to code for primary procedure) | BR | XXX | |
| ■ | | 0100T | Placement of a subconjunctival retinal prosthesis receiver and pulse generator, and implantation of intra-ocular retinal electrode array, with vitrectomy | 16.22 | XXX | |
| ■ | | 0101T | Extracorporeal shock wave involving musculoskeletal system, not otherwise specified, high energy | 2.78 | XXX | |

98.     As noted, CPT code 0101T is listed in the Fee Schedule as a "temporary code" identifying emerging and experimental technology. Temporary codes may become permanent codes or deleted during updates of the code set. Additionally, and as noted in the Fee Schedule, the CPT code (i) is scheduled to be paid using the conversion rate for surgical services, and (ii) does not distinguish between a professional component and technical component, thus confirming that the service need be performed by a licensed physician to be reimbursable.

99.     None of the services that were allegedly performed and billed to GEICO were performed by licensed physicians.

100.    Furthermore, the ESWT allegedly performed on Insureds was fraudulent because the service that was allegedly provided does not qualify for reimbursement under the CPT code for several independent reasons. In the first instance, the charges were fraudulent in that the unlicensed technicians controlled by the Testing Defendants and the Laundering Defendants did

not even actually provide ESWT or any service that satisfied the requirements of CPT code 0101T. Rather, the Testing Defendants and the Laundering Defendants arranged to have the unlicensed technicians perform Radial Pressure Wave Therapy on the Insureds. Radial Pressure Wave Therapy involves the low energy delivery of compressed air and is incapable of generating a true shock wave. Radial Pressure Wave Therapy does not satisfy the requirements of CPT code 0101T, which requires "high energy" shockwave.

101. Second, the charges were fraudulent because the use of ESWT for the treatment of back, neck, and shoulder pain is experimental and investigational in nature. In fact, and in keeping with that characterization: (i) the use of ESWT has not been approved by the US Food and Drug Administration ("FDA") for the treatment of back, neck, or shoulder pain, (ii) there are no legitimate peer reviewed studies that establish the effectiveness of ESWT for the treatment of back, neck, or shoulder pain, and (iii) the Centers for Medicare & Medicaid Services has published coverage guidance for ESWT stating that further research is needed to establish the efficacy and safety of ESWT in the treatment of musculoskeletal conditions; that there is uncertainty associated with this intervention; and it is not reasonable and necessary for the treatment of musculoskeletal conditions and, therefore, not covered.

102. Notwithstanding the experimental nature, the Defendants purportedly provided ESWT as part of a pre-determined fraudulent protocol to virtually every Insured, without regard to each Insured's individual complaints, symptoms, or presentation. In furtherance of that, the Defendants typically submitted a boilerplate, checklist treatment report containing a stamped signature, not an actual signature, and the ESWT was provided to Insureds soon after their accident without giving the patients the opportunity to sufficiently respond to conservative therapies.

103. For example, the Defendants typically rendered ESWT to Insureds less than twenty

(20) days after the accidents, including the following examples:

(i)     Defendants purported to provide ESWT through the Stybel Practice to an
        Insured named KP on September 16, 2021, only 14 days after the Insured's
        accident on September 2, 2021.

(ii)    Defendants purported to provide ESWT through the Stybel Practice to an
        Insured named MY on September 16, 2021, only three days after the
        Insured's accident on September 13, 2021.

(iii)   Defendants purported to provide ESWT through the Stybel Practice to an
        Insured named VF on August 19, 2021, only ten days after the Insured's
        accident on August 9, 2021.

(iv)    Defendants purported to provide ESWT through the Stybel Practice to an
        Insured named AB on August 11, 2021, only eight days after the Insured's
        accident on August 3, 2021.

(v)     Defendants purported to provide ESWT through the Stybel Practice to an
        Insured named JW on August 23, 2021, only nine days after the Insured's
        accident on August 14, 2021.

(vi)    Defendants purported to provide ESWT through the Stybel Practice to an
        Insured named DS on August 26, 2021, only 13 days after the Insured's
        accident on August 13, 2021.

(vii)   Defendants purported to provide ESWT through the Stybel Practice to an
        Insured named KT on August 9, 2021, only 10 days after the Insured's
        accident on July 30, 2021.

(viii)  Defendants purported to provide ESWT through the Stybel Practice to an
        Insured named NM on July 29, 2021, only 12 days after the Insured's
        accident on July 17, 2021.

(ix)    Defendants purported to provide ESWT through the Stybel Practice to an
        Insured named AB on July 19, 2021, only eight days after the Insured's
        accident on July 11, 2021.

(x)     Defendants purported to provide ESWT through the Stybel Practice to an
        Insured named TM on July 8, 2021, only ten days after the Insured's
        accident on June 28, 2021.

These are only representative examples.

32

104.     Additionally, the Defendants routinely provided ESWT to multiple Insureds involved in the same accident from the same Clinics.  For example:

(i)     On March 7, 2021, two Insureds – BM and OP – were involved in the same automobile accident. Thereafter, BM and OP both presented to the same Clinic located at 3632 E Tremont Avenue, Bronx, New York, and each purportedly received ESWT;

(ii)     On March 16, 2021, three Insureds – CF, MG, and AF – were involved in the same automobile accident. Thereafter, CF, MG, and AF all presented to the same Clinic located at 4014A Boston Road, Bronx, New York, and each purportedly received ESWT;

(iii)     On April 11, 2021, two Insureds – JM and FD – were involved in the same automobile accident. Thereafter, JM and FD both presented to the same Clinic located at 430 W Merrick Road, Valley Stream, New York, and each purportedly received ESWT;

(iv)     On April 19, 2021, two Insureds – LG and TH – were involved in the same automobile accident. Thereafter, LG and TH both presented to the same Clinic located at 1110 Pelham Parkway, Bronx, New York, and each purportedly received ESWT;

(v)     On April 24, 2021, three Insureds – OB, KP, and EB – were involved in the same automobile accident. Thereafter, OB, KP, and EB all presented to the same Clinic located at 79-45 Metropolitan Avenue, Flushing, New York, and each purportedly received ESWT;

(vi)     On May 11, 2021, two Insureds – PR and VM – were involved in the same automobile accident. Thereafter, PR and VM both presented to the same Clinic located at 1894 Eastchester Road, Bronx, New York, and each purportedly received ESWT;

(vii)     On June 4, 2021, two Insureds – PB and RC – were involved in the same automobile accident. Thereafter, PB and RC both presented to the same Clinic located at 717 Southern Boulevard, Bronx, New York, and each purportedly received ESWT;

(viii)     On June 26, 2021, two Insureds – SH and JR – were involved in the same automobile accident. Thereafter, SH and JR both presented to the same Clinic located at 3000 Eastchester Road, Bronx, New York, and each purportedly received ESWT;

(ix)     On August 9, 2021, two Insureds – GR and AS – were involved in the same automobile accident. Thereafter, GR and AS both presented to the same

Clinic located at 717 Southern Boulevard, Bronx, New York, and each purportedly received ESWT; and

(x) On August 16, 2021, three Insureds – JP, DB, and JG – were involved in the same automobile accident. Thereafter, JP, DB, and JG all presented to the same Clinic located at 4250 White Plains Road, Bronx, New York, and each purportedly received ESWT.

These are only representative examples.

105.     In all the claims identified in Exhibit "1", the Defendants falsely represented that Fraudulent Services were medically necessary, when, in fact, they were not medically necessary for each Insured and provided, to the extent provided at all, pursuant to predetermined fraudulent protocols and were therefore not eligible to collect No-Fault Benefits in the first instance.

106.     In addition to the billing for ESWT being fraudulent for the reasons described above, the charges were also fraudulent because the bills misrepresented the amounts collectible for each date of service.  More specifically, CPT Code 0101T only contemplates the billing for the code once per date of service.  The code specifically describes the service as pertaining to the "musculoskeletal system", not a patient's individual limb or spine/trunk sections.

107.     Notwithstanding the clear language of the code, the bills fraudulently unbundled the service in the billing that was prepared and submitted by duplicating the code multiple times (and increasing the corresponding charges) for each section of the Insured's body to which the ESWT was performed.  The following are representative examples:

**15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY**

| Date of Service | Place of Service Including Zip Code | Description of Treatment or Health Service Rendered | Unit | Fee Schedule Treatment Code | Charges |
|---|---|---|---|---|---|
| 07/07/2021 | 1568 RALPH AVE, BROOKLYN, NY, 11234 | EXTRACORPOREAL SHOCK WAVE & RADIAL PRESSURE WAVE CERVICAL AREA | 1 | 0101T | $ 700 39 |
| 07/07/2021 | 1568 RALPH AVE, BROOKLYN, NY, 11234 | EXTRACORPOREAL SHOCK WAVE & RADIAL PRESSURE WAVE THORACIC AREA | 1 | 0101T | $ 700 39 |
| 07/07/2021 | 1568 RALPH AVE, BROOKLYN, NY, 11234 | EXTRACORPOREAL SHOCK WAVE & RADIAL PRESSURE WAVE LUMBAR AREA | 1 | 0101T | $ 700 39 |
| 07/07/2021 | 1568 RALPH AVE, BROOKLYN, NY, 11234 | EXTRACORPOREAL SHOCK WAVE & RADIAL PRESSURE WAVE LEFT KNEE | 1 | 0101T | $ 700 39 |

**TOTAL CHARGES TO DATE $ 2801.56**

**15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY**

| Date of Service | Place of Service Including Zip Code | Description of Treatment or Health Service Rendered | Unit | Fee Schedule Treatment Code | Charges |
|---|---|---|---|---|---|
| 08/12/2021 | 150 GRAHAM AVE, BROOKLYN, NY, 11206 | EXTRACORPOREAL SHOCK WAVE & RADIAL PRESSURE WAVE CERVICAL AREA | 1 | 0101T | $ 700 39 |
| 08/12/2021 | 150 GRAHAM AVE, BROOKLYN, NY, 11206 | EXTRACORPOREAL SHOCK WAVE & RADIAL PRESSURE WAVE LEFT SHOULDER | 1 | 0101T | $ 700 39 |
| 08/12/2021 | 150 GRAHAM AVE, BROOKLYN, NY, 11206 | EXTRACORPOREAL SHOCK WAVE & RADIAL PRESSURE WAVE LUMBAR AREA | 1 | 0101T | $ 700 39 |

**TOTAL CHARGES TO DATE $ 2101.17**

108.     In doing so, the Defendants artificially and fraudulently increased the amount of reimbursement to which they would be entitled by three (3) to four (4) times for each date of service.

**E.     The Fraudulent Billing for Independent Contractor Services**

109.     The fraudulent scheme also included the submission of claims to GEICO using the Stybel Practice seeking payment for services provided by individuals that the Stybel Practice never employed.

110.     Under the New York no-fault insurance laws, billing entities (including sole proprietorships) are ineligible to bill for or receive payment for goods or services provided by independent contractors. The healthcare services must be provided by the billing provider itself, or by its employees.

111.     Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that billing entities are not entitled to receive reimbursement under the New

York no-fault insurance laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-21-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals).

112. From July 2021 through October 2021, more than 1,300 separate bills were sent to GEICO using the United States mails seeking payment for the Fraudulent Services purportedly performed by individuals other than Stybel, while falsely representing in every bill that Stybel was the provider of the service in question. This was done intentionally and to avoid the possibility that insurance companies such as GEICO would deny the bill for eligibility if an accurate representation had been made regarding who actually performed the services and their relationship to the billing provider, which was being unlawfully operated and controlled by the John Doe Defendants.

113. In fact, virtually every NF-3 form that was submitted to GEICO appeared as follows:

VERIFICATION OF TREATMENT BY ATTENDING PHYSICIAN OR OTHER PROVIDER OF HEALTH SERVICE
PAGE 3

**16. IF TREATING PROVIDER IS DIFFERENT THAN BILLING PROVIDER COMPLETE THE FOLLOWING:**

| TREATING PROVIDER'S NAME | TITLE | LICENSE OR CERTIFICATION NO | BUSINESS RELATIONSHIP CHECK APPLICABLE BOX | | |
|---|---|---|---|---|---|
| | | | EMPLOYEE | INDEPENDENT CONTRACTOR | OTHER (SPECIFY) |
| Elena Borisovna Stybel | MD | Lic # 224376 | No | | |
| | | | | | |
| | | | | | |

17  IF THE PROVIDER OF SERVICE IS A PROFESSIONAL SERVICE CORPORATION OR DOING BUSINESS UNDER AN ASSUMED NAME (DBA), LIST THE OWNER AND PROFESSIONAL LICENSING CREDENTIALS OF ALL OWNERS (Provide an additional attachment if necessary).

Elena Borisovna Stybel      224376      OWNER

| 18. IS PATIENT STILL UNDER YOUR CARE FOR THIS CONDITION? | YES ☐ | NO ☐ |
|---|---|---|

19. ESTIMATED DURATION OF FUTURE TREATMENT

Not Determined at this time

114.    The statements in each of the NF-3 forms were false and fraudulent in that the unlicensed technicians who performed the Fraudulent Services were never (i) employed by Stybel or the Stybel Practice, or (ii) under Stybel's direction and/or control.  In fact, the unlicensed technicians were simultaneously performing services for multiple other "providers" being operated and controlled by the Testing Defendants and the Laundering Defendants and were paid without regard to the physician's name or entity through whom the Fraudulent Services were billed.

115.    In keeping with the fact that the Fraudulent Services were provided by unlicensed technicians as opposed to Stybel, checks for tens of thousands of dollars were issued from the Evergreen bank account at the direction of the other Testing Defendants for "tech" services.

116.    Because the Fraudulent Services, to the extent provided at all, were performed by individuals not employed by Stybel and/or the Stybel Practice, the Defendants never had any right to bill or to collect No-Fault Benefits for that reason or to realize any economic benefit from the claims seeking payment for the Fraudulent Services, in addition to all others identified in this Complaint.  The misrepresentations and acts of fraudulent concealment outlined in this Complaint

were consciously designed to mislead GEICO into believing that it was obligated to pay the claim submissions.

### III.   The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO

117.   To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted to GEICO thousands of NF-3 forms, AOBs and medical reports/records using the name of the Stybel Practice and its tax identification number seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

118.   The NF-3 forms, reports, AOBs and other documents submitted to GEICO by and on behalf of the Defendants were false and misleading in the following material respects:

(i)   The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of the Defendants uniformly misrepresented that Stybel had performed the Fraudulent Services and that her name, license and the tax identification number of the Stybel Practice was being legitimately used to bill for the Fraudulent Services, making them eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) despite the fact that the Testing Defendants and the Laundering Defendants unlawfully and secretly controlled, operated and managed the medical "practice";

(ii)   The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of the Defendants, uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided;

(iii)   The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of the Defendants, uniformly concealed the fact that the Fraudulent Services were provided -- to the extent provided at all -- pursuant to illegal kickback and referral arrangements;

(iv)   The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of the Defendants uniformly misrepresented that the Fraudulent Services were medically necessary when the Fraudulent Services were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; and

(v)   The NF-3 forms, letters and other supporting documentation submitted by and on behalf of the Defendants, uniformly misrepresented to GEICO that the claims were eligible for payment pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. §

65-3.11, even though the services were provided by unlicensed individuals not employed by Stybel or the Stybel Practice.

## IV.     Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

119.    Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

120.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, Defendants systematically made material misrepresentations, concealed their fraud and the underlying fraudulent scheme, and went to great lengths to accomplish this concealment.

121.    Specifically, the Defendants knowingly misrepresented and concealed facts related to the participation of Stybel in the performance of the Fraudulent Services and Stybel's ownership, control and/or management of the Stybel Practice. Additionally, the Defendants entered into complex financial arrangements with one another that were designed to, and did, conceal the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

122.    Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed, to the extent they were performed at all, pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Services.  In addition, the Defendants knowingly misrepresented and concealed facts related to the employment status of the unlicensed individuals to prevent GEICO from discovering that the Fraudulent Services were not eligible for reimbursement, because they were not provided by individuals that were employed by Stybel and/or the Stybel Practice.

123.    GEICO takes steps to timely respond to all claims and to ensure that No-fault claim denial forms or requests for additional verification of No-fault claims are properly addressed and

mailed in a timely manner. GEICO is also under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $1,455,000.00 based upon the fraudulent charges.

124.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### AS AND FOR A FIRST CAUSE OF ACTION
**Against Stybel and the Stybel Practice**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

125.    GEICO incorporates, as though fully set forth herein at length, each and every allegation contained in this Complaint.

126.    There is an actual case and controversy between GEICO on the one hand and Stybel and the Stybel Practice on the other hand regarding more than $797,000.00 in unpaid billing for the Fraudulent Services that has been submitted to GEICO.

127.    Stybel and the Stybel Practice have no right to receive payment from GEICO on the unpaid billing because the billed-for services were submitted through a medical practice not legitimately owned or controlled by a licensed physician, but which was being operated, managed, and controlled by the Testing Defendants and the Laundering Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers.

128.     Stybel and the Stybel Practice have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services were not medically necessary and were provided – to the extent provided at all – pursuant to illegal kickbacks and referral relationships between the Defendants and the Clinics.

129.     Stybel and the Stybel Practice have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services were not medically necessary and were provided – to the extent provided at all – pursuant to predetermined fraudulent protocols that serve to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds.

130.     Stybel and the Stybel Practice have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services were not medically necessary and were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers.

131.     Stybel and the Stybel Practice have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services fraudulently misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

132.     Stybel and the Stybel Practice have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services fraudulently misrepresented that they were performed by Stybel, but were instead performed -- to the extent provided at all -- by unlicensed individuals who were neither supervised by nor employed by Stybel or the Stybel Practice.

133.     Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Stybel and the Stybel Practice have no right to receive payment for any pending bills submitted to GEICO.

## AS AND FOR A SECOND CAUSE OF ACTION
**Against Stybel, the Testing Defendants, Laundering Defendants and John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

134.    GEICO incorporates, as though fully set forth herein at length, each and every allegation contained in this Complaint.

135.    The Stybel Practice is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

136.    Stybel, the Testing Defendants, the Laundering Defendants and the John Doe Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of the Stybel Practice's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges seeking payments that the Stybel Practice was not eligible to receive under the No-Fault Laws because: (i) the billed-for services were submitted through a medical practice not legitimately owned or controlled by a licensed physician, but which was being operated, managed, and controlled by the Testing Defendants and the Laundering Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the billed-for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics; (iii) the billed-for services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (iv) the claim submissions seeking payment for the billed-for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services

that purportedly were provided; and (v) the billed-for services - to the extent provided at all - were not provided by Stybel or any other licensed physician, but by persons who were unlicensed, and not directly supervised by Stybel or employed by the Stybel Practice.

137. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

138. The Stybel Practice's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which the Defendants operated the Stybel Practice, inasmuch as the Stybel Practice never operated as a legitimate medical practice, never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for the Stybel Practice to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through the Stybel Practice to the present day.

139. The Stybel Practice is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other New York automobile insurers. These inherently unlawful acts are taken by the Stybel Practice in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,455,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Stybel Practice.

140.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A THIRD CAUSE OF ACTION
### Against Stybel, the Testing Defendants, Laundering Defendants and John Doe Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

141.    GEICO incorporates, as though fully set forth herein at length, each and every allegation contained in this Complaint.

142.    The Stybel Practice is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affected interstate commerce.

143.    Stybel, the Testing Defendants, the Laundering Defendants and the John Doe Defendants are employed by and/or associated with the Stybel Practice. Stybel, the Testing Defendants, the Laundering Defendants and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Stybel Practice's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that the Stybel Practice was not eligible to receive under the No-Fault Laws, because: (i) the billed-for services were submitted through a medical practice not legitimately owned or controlled by a licensed physician, but which was being operated, managed, and controlled by the Testing Defendants and the Laundering Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the billed-for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and

the Clinics; (iii) the billed-for services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (iv) the claim submissions seeking payment for the billed-for services uniformly misrepresented and exaggerated the level, nature, necessity and results of the Fraudulent Services that purportedly were provided; and (v) the billed-for services -- to the extent provided at all -- were not provided by Stybel or any other licensed physician, but by persons who were unlicensed, and not directly supervised by Stybel or employed by the Stybel Practice. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

144. Stybel, the Testing Defendants, the Laundering Defendants and the John Doe Defendants knew of, agreed to and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

145. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,455,000.00 pursuant to the fraudulent bills submitted by Defendants through the Stybel Practice.

146. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A FOURTH CAUSE OF ACTION
### Against All Defendants
### (Common Law Fraud)

147. GEICO incorporates, as though fully set forth herein at length, each and every allegation contained in this Complaint.

148. Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

149. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Stybel had performed the Fraudulent Services and that her name, license and the tax identification number of the Stybel Practice was being legitimately used to bill for the Fraudulent Services, making them eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) when, in fact, Stybel never performed any of the services and the Testing Defendants and the Laundering Defendants unlawfully and secretly controlled, operated and managed the Stybel Practice; (ii) the representation that the billed-for services had been rendered and were reimbursable, when, in fact, the claim submissions uniformly misrepresented and exaggerated the level, nature, necessity, and results of the services that purportedly were provided; (iii) the representation that the billed-for services were eligible for reimbursement, when, in fact, the services were provided -- to the extent provided at all -- pursuant to illegal kickback and referral arrangements between the Defendants and the Clinics; (iv) the representation that the billed-for services were medically necessary when they were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; and (v) the representation the billed-for services were eligible for payment because the services were provided by Stybel, when, in fact, the services were provided by unlicensed individuals that were never supervised by Stybel nor employed by the Stybel Practice.

150.    Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through the Stybel Practice that were not compensable under New York no-fault insurance laws.

151.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,455,000.00 pursuant to the fraudulent bills submitted by the Defendants.

152.    Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

153.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**Against All Defendants**
**(Unjust Enrichment)**

154.    GEICO incorporates, as though fully set forth herein at length, each and every allegation contained in this Complaint.

155.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

156.    When GEICO paid the bills and charges submitted by or on behalf of the Stybel Practice for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants improper, unlawful, and/or unjust acts.

157.    Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

158. Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

159. By reason of the above, Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,455,000.00.

### JURY DEMAND

160. Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor and against the Defendants, as follows:

A. On the First Cause of Action against Stybel and the Stybel Practice, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Stybel and the Stybel Practice have no right to receive payment for any pending bills for the Fraudulent Services submitted to GEICO;

B. On the Second Cause of Action against Stybel, the Testing Defendants, the Laundering Defendants and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,455,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C. On the Third Cause of Action against Stybel, the Testing Defendants, the Laundering Defendants and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,455,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D. On the Fourth Cause of Action against all Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,455,000.00 together

with punitive damages, costs, interest, and such other and further relief as the Court deems just and proper; and

      E.      On the Fifth Cause of Action against all Defendants, more than $1,455,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated: February 9, 2023

RIVKIN RADLER LLP

By: ___*/s/ **Barry I. Levy**_____
        Barry I. Levy, Esq.
        Michael Vanunu, Esq.
        Garin Scollan, Esq.
926 RXR Plaza
Uniondale, New York 11556
 (516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*